Van Voorhis, J.
This is a minority stockholders’ suit on behalf of International Railways of Central America (hereafter described as Irca) against United Fruit Company (hereafter described as United) to recover damages arising from what are claimed to have been insufficient freight rates charged by Irca for the transportation in Guatemala of bananas for export and of imported materials and supplies for United or its subsidiary. *436 Exerting practical control over Irca, United is charged with having obtained inadequate rates for its advantage to the detriment of Irca’s minority stockholders. Without restating the evidence on which the findings depend, we are satisfied that the findings are sustained that United was in practical control of Irca at least after the creation of the voting trust in 1928, and stood in a fiduciary relationship to Irca as respects the latter’s minority shareholders insofar as concerned business transactions between Irca and United or its subsidiary (Farmers’ Loan & Trust Co. v. New York & Northern Ry. Co., 150 N. Y. 410; Godley v. Crandall Godley Co., 212 N. Y. 121; Kavanaugh v. Kavanaugh Knitting Co., 226 N. Y. 185; Blaustein v. Pan Amer. Petroleum & Transp. Co., 293 N. Y. 281; Chelrob, Inc., v. Barrett, 293 N. Y. 442; Ripley v. International Rys., 276 App. Div. 1006). The Referee determined the deficiency between the freight rates which were paid and what he deemed to have been the fair and reasonable value of the transportation services rendered, and gave judgment to Irca for the deficiency. The Referee’s findings have been affirmed by the Appellate Division.
Appellant United relies for reversal and dismissal of the complaint primarily upon the Statute of Limitations and the controlling character of certain unrescinded contracts made in 1936. Under subdivision 8 of section 48 of the Civil Practice Act, the recovery has been limited to the period beginning February 14, 1943, six years before the commencement of this suit. United’s contention is that the rates charged were fixed by agreement in 1936, and that it is too late to attack those contracts. The judgment appealed from determines those contracts to be valid and binding except with respect to the freight rates. United contends that this is inconsistent, and that unless those agreements are rescinded the rates stipulated in them are binding as part of the consideration to United and its subsidiary for benefits which these contracts conferred upon Irca (Barr v. New York, L. E. & W. R. R. Co., 125 N. Y. 263; New York Trust Co. v. American Realty Co., 244 N. Y. 209). Under those decisions, and on principles of fair dealing, it is clear that where a fiduciary contracts with its cestui regarding the individual property rights of the fiduciary, the transaction may be rescinded where there has been overreaching, but the cestui cannot knowingly retain the benefits which it receives under such agreements and simultaneously repudiate its obligations thereunder. An agree *437 ment with a fiduciary may be set aside, but the courts cannot compel a fiduciary to enter into an agreement which it has not made. The consideration running to Irca under the 1936 contracts did not consist of property which United held in a fiduciary capacity, but it was bargaining with respect to property rights which it owned. If the freight rates which were paid by Irca under the 1936 contracts were part of the consideration for benefits which Irca received, the position of United on this appeal might well be correct. It is now too late to rescind the 1936 contracts; an unsuccessful attempt was made to rescind them in the Federal courts (Henis v. Companía Agrícola de Guatemala, 116 F. Supp. 223, affd. 210 F. 2d 950), and the agreements would not be reformed in court so as to make them provide for different rates from those which they specify. An analysis of these agreements leads us to conclude, however, that the rates which they fix were not an integral part of the consideration for the benefits under them running to Irca. The courts below have apparently held and we believe the evidence to be clear that the rate agreements were separate from the other contracts or portions of contracts on which United relies upon this appeal, and that they are divisible from the rest of the consideration. The rule has been stated in Black on Rescission and Cancellation (2d ed., Vol. 3, § 585) that “ When a contract is separable or divisible into a number of elements or transactions, each of which is so far independent of the others that it might stand or fall by itself, and good cause for rescission exists as to one of such portions, it may be rescinded and the remainder of the contract affirmed. And it has been held that where a contract consists of parts so distinct and independent that each could be performed without reference to the others, a failure of one of the parties to perform one of the parts or terms of the contract does not authorize the other to rescind the whole contract, and refuse to accept a tender of performance of the remainder of the contract by the party in default.” The same principle of divisibility has been applied to restitution as essential to rescission (Corbin, Contracts, § 1111; 5 Williston, Contracts [Rev. ed.], § 1530; Schwasnick v. Blandin, 65 F. 2d 354, 358, per L. Hand, J.; Restatement, Contracts, §§ 351 [a], 487; Thompson v. Fesler, 74 Ind., App. 80). In Bamberger Bros. v. Burrows (145 Iowa 441, 451) it was said: ' ‘ If the contract consists of several distinct and independent *438 parts, each of which can be performed without reference to the other, a failure of one of the parties to perform one of the terms does not authorize the other to rescind the whole and refuse to accept performance of the other terms by the party so in default. ’ ’
It follows from these principles that, if the freight rate provisions of these 1936 contracts were divisible from the other portions of the agreements, the charging of inadequate freight rates by Irca would not have furnished a basis on which the rest of the agreements, supported by independent consideration, could have been rescinded. Under that state of facts, it was not incumbent upon Irca represented by its minority stockholders to attempt to rescind the other portions of the agreements made in 1936, nor did the existence of the other portions of these agreements operate as a bar to this suit for damages based on unjust enrichment of United and Agricola by the carriage of freight at inadequate rates. A cause of action would lie for the difference between the stipulated rates and the fair and reasonable cost of the transportation furnished (Chelrob, Inc., v. Barrett, 293 N. Y. 442, supra), without rescinding the rate agreements by themselves.
Whether this action can be maintained on this theory depends upon whether the parties in 1936 ‘ ‘ assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out. * * * Did the parties give a single assent to the whole transaction or did they assent separately to several things? ” (3 Williston, Contracts [Bev. ed.], § 863.)
The Appellate Division refers to the rate agreements as separate agreements. The Beferee poses the query whether the 1936 rate agreements are divisible or entire, and appears to have inferred the former to be the fact. We think that the evidence admits of no other conclusion. The 1936 contractual arrangements consist of ten purportedly separate contracts between Irca and United, or between Irca and United’s subsidiary known as Agricola. The circumstance that they are different documents does not necessarily mean that they do not form a single contract (Crabtree v. Elizabeth Arden Sales Corp., 305 N. Y. 48), but it does indicate that they are separate unless the history and subject matter shows them to be unified. Thq *439 first of these 1936 contracts, entitled " Main Agreement ’ ’, is between Irca and Agricola. It does not mention freight rates, but provides that Agricola will purchase 10 new locomotives and 300 banana cars for use by Irca ‘ ‘ under separate trackage and operating agreements, the terms of which have been agreed to and are satisfactory to the Railway Company. ’ ’ For 20 years Agricola agrees to refrain from building a port without Irca’s consent on the Pacific seaboard of Guatemala, which might compete with Irca, and it agrees to use the main lines of Irca to transport its bananas and to carry its imported materials and supplies ' ‘ under such arrangements as the parties hereto may agree upon from time to time.” (Italics supplied.) Agricola agrees to obtain permission for Irca to use jointly for 20 years with the owner the main line of railway running for a distance of about 30 miles from Quiligua to Bananera, paralleling Irca’s own main line, and to provide Irca with certain agreements useful for obtaining gravel ballast and controlling the construe--, tion of a port on the Atlantic seaboard. Irca agrees to deliver. to Agricola $1,750,000 principal amount of a new issue of 3%% 20-year collateral notes together with 185,000 shares of its authorized but unissued common stock (giving United control over 42.67% of Irca’s voting shares) for which Agricola covenanted to pay $2,165,000 in cash, the disposition of which by Irca is directed in detail. Another paragraph provides that this main agreement shall take effect upon the approval of the stockholders of Irca at a meeting duly called for the purpose. This is the only one of the ten agreements of 1936 which was submitted to the stockholders, nor did its submission or the notice of the stockholders ’ meeting disclose that long-term agreements were being proposed or entered into specifying rates for the carriage of Agricola’s freight across Guatemala. Other agreements were signed at the same time, but not submitted to the stockholders, among which were contracts entitled “ Track-age ’ ’ and ‘' Operation of Trains ’ ’ agreements, which contemplated that Agricola would own and provide the necessary locomotives and banana cars to handle its traffic from the western coast of Guatemala to Puerto Barrios on the east coast for which Irca agreed to provide the trackage rights at $30 per loaded car. The operation of trains agreement covered the operation of these trains for Agricola by Irca, which was to be *440 reimbursed “ for the total amount of expense incurred by [Irca] in performing the aforesaid activities for [Agricola].” Both of these agreements were for terms of 25 years from 1936. A supplemental agreement, signed upon the same day, fixed the amount of expense for which Irca was to be reimbursed under the operating agreement at $30 per car of bananas transported to Puerto Barrios, in addition to the $30 per car under the trackage agreement. From this reimbursement to Irca for the operational expense was to be deducted interest on and amortization of the cost of Agricola’s equipment operated by Irca, consisting of ‘' ten locomotives and three hundred cars for the time being and such additional equipment as hereafter we may agree upon.” As will be mentioned later, these agreements provided that the trackage fees and the operating fees were subject to change at any time by arbitration in event of any change in the costs of bananas in Guatemala or in transportation costs, and this combined figure of $60 per car simply restated the $60 per car rate established for 25 years for the same transportation in 1933 by agreement between Irca and United (subject likewise to change from time to time by arbitration). The rates fixed by the 1933 agreement were not altered, and correspondence between officers of the companies at the time shows that they were intended to remain the same but that the $60 per car figure was broken down into $30 for trackage and $30 for operation of trains in order to conceal the discrepancy between the $60 per car charged to Agrícola and the $130 per car charged to independents for a similar haul after 1939. So large a discrimination in United’s interest was beginning to excite criticism in Guatemala. The chairman of the board of United became exercised about this as a question of public relations, and he insisted that the preferential treatment of United should not be altered but be made less obvious. The “ track-age ” and “ operating” agreements were the method adopted for doing this. The name ‘ ‘ Agricola ’ ’ was even painted on banana cars owned by Irca to make the $60 preferential rate seem more justifiable. We are concerned with this as an aid to determining whether the rate agreements were severable from the rest of the 1936 contractual provisions so as to determine whether rescission of all of the 1936 contracts was necessary to enable Irca to recover from United for unjust enrichment result *441 ing from inadequate freight rates. These rate agreements could not have been dependent on consideration running to Irca in 1936, as United contends, if the same rates had been fixed 3 years earlier for 25 years without regard to any covenant to refrain from constructing a Pacific seacoast port or any of the other consideration furnished by United or Agricola to Irca in 1936. A covenant to do what one is already under a legal obligation to do is not sufficient consideration for another contract (Carpenter v. Taylor, 164 N. Y. 171). Assuming, therefore, that Irca was already bound to these freight rates by contract in 1933, a reaffirmation of the same obligation in 1936 would not be an integral part of the consideration for the 1936 agreements. Even though it were said that the latter contracts extended the rates until 1961 from the expiration date of the 1933 contracts in 1958, this so clearly was not the animating purpose of these transactions that, although it might be sufficient to defeat a claim of invalidity due to total absence of consideration, it only emphasizes the divisible nature of the rate agreements from the rest of the 1936 contracts. It is plain that if Irca in 1933 was already bound for 25 years to the $60 rate, it was not induced to give its assent to the $60 rate by consideration for Irca’s advantage provided for the first time in 1936.
No rescission of the rate agreements, standing by themselves, is necessary to recovery by plaintiffs; it was United-Agricola, standing in fiduciary relation to Irca, which obtained and retained these transportation services at too low a price, and no theory of rescission of the rate agreements alone is necessary to enable Irca to recover from its fiduciary for unjust enrichment, provided that the continuance of these low rates was not an indivisible part of the consideration for the rest of the 1936 agreements. Considered as divisible, the effect of the rate agreements is similar to any situation where the fiduciary has received and retained property or services at less than value. It has to pay the difference, and the result is not different merely because the rate transaction has taken the form of a contract. The obligations of the fiduciary cannot be escaped merely by making a contract with the cestui, nor is rescission necessary (if the rate contracts are divisible) since the cestui has received nothing under them belonging to the fiduciary which it is bound to give up.
*442 . It has been assumed for the purposes of discussion, thus far, that the ‘ ‘ trackage ”, “ operating ’ ’ and ‘ ‘ supplemental operating ’ ’ agreements of 1936 did fix the freight rates to be paid by United or its subsidiary for 25 years. Actually they did no such thing. Being legally subject to change, the continuance of these rates could not have been relied upon by United or Agricola in entering into any of the 1936 contracts. This further demonstrates that the rate provisions were divisible. As has been said, the “Main Agreement” — the one which was submitted to Irca’s stockholders—made reference to trackage and operating agreements, reciting that Agricola would use the lines of the railroad during the term of the agreement ' ‘ under such arrangements as the parties hereto may agree upon from time to time.” The supplemental operating agreement (which fixed the $30 per car operating fee) provides that the rates for both the trackage and operating agreements (aggregating $60 per car) are subject to change on written request from either party ‘ ‘ at any time or from time to time during the term of this contract ”, the changes to be agreed upon, if possible, but otherwise to be fixed by arbitration. The circumstance that these changes were to be made in event of changes in the costs of the banana or transportation businesses does not alter the fact that the door was thus left wide open to modifications in these freight rates during the 25-year term of these agreements. Pursuant to these clauses the freight rates actually were changed by supplemental agreements in 1946, 1948, 1951 and 1952. These changes were not acts of grace on the part of United. It evidently anticipated changes that might be made unless consent were given. It is immaterial whether arbitration was demanded, in determining whether the freight rate provisions were severable from the sum total of the 1936 contractual arrangements. If the rates were subject to change, their continuance without change could not have been relied upon by United as part of the consideration in making the other 1936 contracts.
For these reasons, we hold that there was no inconsistency in granting recovery to Irca at the instance of plaintiffs on the theory of unjust enrichment without rescinding the 1936 agreements. Neither could it be held, although respondent-appellant United does not make the point, that recovery in this action is barred by failure to rescind the 1933 agreement. When that *443 agreement is examined, it is found to provide that for all bananas transported to Puerto Barrios from the Pacific side “ the rates shall be those from time to time agreed upon between the parties and set forth in contract supplementary hereto.” The supplemental contract sets the rate for these shipments at $60 per car, subject to change by arbitration at intervals in event of changes in the costs of bananas or of transportation. These rate clauses are divisible from the main agreement of 1933. The reason for not making them an integral part of the consideration may well have been that United relied upon its practical control of Irca to insure that whatever other or different rates might be fixed would be satisfactory, but that does not aid the defense in this litigation.
The rate for hauling eastern Guatemalan bananas, less in volume than those from the Pacific coast area, was not covered by the 1936 agreements, presumably for the reason that there was no independent shippers’ banana rate for shipments by others in that area to create a public relations problem. There was no occasion, as in the case of shipments from western Guatemala, to put a better face upon what had already been agreed upon in 1933. The banana shipments originating near the east coast, likewise destined for Puerto Barrios, were set at 11% cents per stem in 1913. The main contract of 1933 continues the same rate for five years, except that it is increased by % cent per stem in case of reduced volume of shipments. It could hardly be contended after 1933 that this rate of 11% cents survived from the 1913 contract, but, in any event, the parties rendered it subject to revision upward or downward by mutual agreement or arbitration so that it could not be regarded as an integral part of any consideration moving to Irca, which would have had to be restored before suit could be maintained to recover fair and reasonable charges for the transportation.
The third item of recovery allowed by the Referee, in addition to the transportation of bananas for export originating on the western or eastern coastal areas of Guatemala, concerns underpayment for transporting imports of materials and supplies for Agrícola from Barrios to the west coast. This subject was covered by a separate one of the ten 1936 contracts, in the form of a letter agreement, which says “ Supplementing our Agreements of even date, this is to confirm that for the duration of *444 said Agreements we will charge you Sixty Dollars ($60.00) TI. S. currency per carload for the transportation of the materials, equipment and supplies which you may require for the construction of new railroad lines and irrigation works on the Pacific slope of Guatemala, and for the development of new banana plantations and their appurtenances. * * * This rate shall be subject to the provisions of the above agreements which permit adjustments in certain contingencies as therein provided.”
These rates were reduced by agreement in 1946 to $48 where the materials and supplies were carried in banana cars, and increased to $100 per freight carload of 40,000 pounds and $125 per freight carload of 50,000 pounds. The Beferee increased these amounts for the years in suit. It may be said with respect to United’s argument that this charge along with the others cannot be altered by reason of the 1936 agreements, that this rate was, to be sure, established by contract for the first time in 1936, and that in that regard it differs from the other two. Nevertheless, this rate was established by separate supplementary agreement, which purports to cover only the subject of freight rates on imports. It is divisible from the subject matter of the rest of the contracts, and, as in case of the others, this rate was subject to change if conditions warranted.
United argues that there is no evidence and no finding of any increases of price or cost levels so as to call the arbitration clauses in these contracts into operation, and that the arbitration clauses were never invoked. It is hard to believe that there have been no changes in costs of bananas or transportation since 1913 when the 11%-cent-per-stem east coast rate was established, or since 1933 when the $60 banana car rate originated for export shipments from the west coast area. This point of United might be of greater consequence if these transportation agreements had been made at arm’s length, and were not subject to the infirmity of having been made between a fiduciary and its cestui. As it is, the question is whether Irca through plaintiffs can recover the difference between what it was paid by its fiduciary and the value of the transportation services which its fiduciary obtained. Irca can recover these amounts on the theory of unjust enrichment unless it is barred by neglect to rescind the 1936 agreements within the period of the Statute of *445 Limitations by making restitution of benefits (other than the stipulated freight rates) which Irca has received. Restitution and rescission are unnecessary, however, under the authorities which have been cited, unless the rate agreements are a dependent part of the consideration for the entire nexus of contractual rights and liabilities established by the 1936 contracts. The test is whether the parties in 1936 assented to all the promises as a single whole or assented separately to several things (Williston, Contracts, supra). That they did the latter, and that the rate provisions are divisible as the courts below have indicated, is clearly apparent—among other matters — from these rate arbitration clauses. These clauses, whether or not they were or could have been invoked, demonstrate that United did not rely on the continuance of any stipulated freight rates over a 25-year -period as consideration for the purchase of its interest-bearing notes and unissued stock, for refraining from constructing a western coastal seaport, for financing the purchase of rolling stock at Irca’s expense or furnishing other benefits to Irca for United’s own primary advantage. Knowing the broad powers of arbitrators on the facts and the law, and the fluctuating nature of costs of bananas and transportation in Guatemala (which the rate agreements never tire of reciting), it is inconceivable that United relied on the unchanging nature of these freight rates in assenting to the other contracts. It is apparent that United did not rely on its contracts but on its working control over Irca to keep these' freight rates at their low level, as the contemporary correspondence indicates. The arbitration clauses supplied a flexibility in the legal rate structure which improved the appearance and could be indulged so long as United controlled both sides of the bargaining table. The fact that arbitration was not demanded, under these circumstances, does not disclose reliance on contractual durability of the rate structure.
Other contentions may be mentioned briefly. The judgment in Henis v. Companía Agricola de Guatemala (supra) dismisses an action in the United States District Court in Delaware to rescind the 1936 agreements. It was for a different cause of action. Rescission of those agreements was not necessary, it is held, in order to enable plaintiffs to maintain the present action. Neither is the defense valid that the stockholders of Irca ratified *446 the freight rates which were charged. Since for the reasons above stated the 1936 contracts are not controlling on this cause of action, which is for unjust enrichment arising from separate shipments made after February 14,1943, plaintiffs need not have been stockholders of Irca in 1936 under section 61 of the General Corporation Law. Concerning the defense of ratification by stockholders, only one of the 1936 agreements was submitted to the stockholders, as has been stated, nor did that contract (the so-called “Main Agreement ”) or the notice of stockholders’ meeting mention that it was proposed to fix freight rates for any period. The stockholders’ notice may not have been defective in this respect in view of the fact that only a flexible rate structure was erected, and by separate agreements, but that does not spell ratification of any long-term rates. Even though the “ trackage ”, “ operation of trains ” and the “ supplementary ’ ’ agreement to the contract for operation of trains were attached to the minutes and physically present at the stockholders ’ meeting, that did not bring them to the attention of stockholders who voted by proxy in reliance on the notice of stockholders ’ meeting.
Plaintiffs have appealed from the judgment on the basis that the report of the Referee indicates that he omitted to award the full difference between the freight rates charged to United and the so-called ‘ independent ” or “ public ’ ’ rates promulgated by the railroad for shipment of bananas by others from the west coast for export and of imported materials and supplies destined to the west coast area. Considerable attention has been given during the trial to whether special arrangements were permitted with particular shippers under Guatemalan law. Apparently they were not prohibited during the period covered by this lawsuit. The point in the case insofar as the New York courts are concerned is not so much whether Irca has fostered a monopoly in United in the Guatemalan banana business, as whether it has been adequately paid for what it has done for United. When the report of the Referee is analyzed to ascertain what he did, he appears to have directed judgment at the instance of plaintiffs in amounts reached by computing the difference between what Irca was paid by United-Agricola and what he deemed to have been the fair and reasonable valuation of the services rendered. It was within his province, and that of the Appellate *447 Division, under the evidence, to find the amounts of damages on that basis as facts.
While ordinarily a court is not empowered to fix rates, it may determine appropriate rates for the purposes above stated in an action of this character down to the time of entry of its judgment. The judgment here was entered December 19, 1957 and amended January 2, 1958. As of January 2, 1958, for the purposes stated, it determines final constant rates, subject to any substantial future change in economic or other conditions affecting the fairness of rates, in which event application may be made at the foot of the judgment for appropriate relief. This we believe the court did by the judgment appealed from and had the power to do.
As so construed, the judgment appealed from should be affirmed, without costs.