**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Plaintiff,**

v.

**UNITED BRANDS COMPANY, Defendant.**

**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Plaintiff,**

v.

**COMPANIA AGRICOLA de GUATE-MALA, Defendant.**

No. 65 Civ 479.

United States District Court, S. D. New York.

May 8, 1973.

Leventritt, Lewittes & Bender, New York City, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

GURFEIN, District Judge.

This is an antitrust and contract action brought by International Railways of Central America (IRCA) against United Brands Company (UB), successor in interest to the United Fruit Co. (UF) and Compania Agricola de Guatemala (CAG), a subsidiary of UB.[1] The amended complaint alleges essentially (1) that as a consequence of a predominant influence of UF in the Guatemalan banana industry IRCA was deprived of revenues from the shipment of bananas by competitors of UF, who, but for the violations, would have shipped more bananas over the plaintiff's railroad; (2) that as a result of UF's virtual absolute control of IRCA, UF deterred the shipment over IRCA of bananas competitive to UF and CAG with a consequent loss of profits to IRCA; and (3) that in violation of a contract between UF and IRCA executed in 1948, UF deliberately, as a reprisal for IRCA's success against it in a New York State action, stopped growing bananas in Western Guatemala, with a concomitant loss to IRCA of prof-

its which could have been realized from the shipment of bananas. In the aggregate, IRCA demands judgment in the sum of $169,000,000 trebled, or $507,000,000. As a result of Judge Friendly's opinion on the appeal relating to a prior motion in this case (see below), the amount of damages which IRCA can properly claim will be far less. UB has now moved for summary judgment on several grounds.

The background of the controversy is as follows. At the turn of the century one Minor C. Keith owned a controlling interest in UF. In 1904 Keith acquired control of the Guatemala Northern Railroad and a large tract of undeveloped jungle ceded to the Railroad by the Guatemalan Government. In order to raise funds for his Railroad investment he sold all but 10% of his interest in UF. IRCA transferred some 50,000 acres of unplanted jungle to UF which was to undertake to plant 5,000 acres of bananas over the next 4 to 5 years. IRCA obligated itself not to encourage directly or indirectly any competition to UF in Guatemala, and to give UF detailed reports on the movement by IRCA of bananas for any other shipper. These original arrangements between UF and IRCA were confined to banana growing and shipping in Eastern Guatemala. The only deepwater ports are located in Eastern Guatemala, the primary one being Puerto Barrios. The Pacific Coast of Guatemala has no natural deepwater ports.

All of UF's bananas destined for the United States and Europe were shipped via IRCA. During the 1920s UF conceived a plan to expand its banana plantations into Western Guatemala, and to increase its control over IRCA. In 1928, a syndicate which included UF, purchased Keith's interest in IRCA. UF with 71,000 shares of common stock, became the largest single stockholder. The stock purchased by the syndicate was placed in a voting trust under which

---

1. UF will at times be used to mean UB since UF is the historically relevant name.

UF through a trust company as its agent, nominated two of the five trustees. From 1928 on UF exercised a dominating, though secret, influence in IRCA.[2]

As UF's interest in Western Guatemalan banana development increased, it sought further to consolidate its control over IRCA to insure favorable rates and service on its own products, and to prohibit the same favorable rates to its competitors' products. In 1936, CAG, UF's subsidiary which operated UF's Western Guatemalan banana plantations at Tiquisate acquired 185,000 shares of IRCA stock from IRCA at a low price and the voting trust was dissolved. In Judge Friendly's words, "from this time [1936] UF, could and did control the election of IRCA's nine directors, although it regularly allowed the banking interests to submit four nominees for its approval. UF's control was exercised even more potently by the designation, from 1928 on, of the officer in charge of its tropical operations as 'special adviser' to IRCA's board, chairman and president. For many years, the extent of UF's stock ownership and dominance of IRCA was concealed." International Railways of Central America v. United Fruit Company, 373 F.2d 408, 410 (2 Cir. 1967).

In 1933, UF and IRCA entered into a contract whereby a freight rate was established for UF which amounted to only slightly more than half of what UF's competitors were required to pay. In 1936, the 1933 rates were reaffirmed with additional provisions added. It was this 1936 contract which provided for the purchase by CAG of the 185,000 shares of IRCA's unissued stock and 3% notes for $2,165,000 in cash. CAG also agreed to purchase ten new locomotives and 300 banana cars for use on IRCA tracks and agreed not to build a West Coast port so as to insure the movement of the produce from the newly opened Tiquisate banana lands over IRCA's rails to East Coast ports. More-over, in this contract CAG agreed to use IRCA's lines to ship its bananas and import its supplies to Tiquisate.

In a separate agreement, trackage rights were granted CAG to operate its banana trains over IRCA's lines. In another separate agreement, IRCA undertook to operate CAG's trains and to maintain CAG's locomotives and rolling stock; and CAG was to reimburse IRCA for the costs incurred.

In a supplementary letter agreement, the parties added a provision for the adjustment of rates upon a change in price affecting the costs and charges of producing, acquiring, selling and transporting Guatemalan bananas. In the event the parties could not agree on such adjustments, an arbitration clause was provided.

In 1948 CAG and IRCA entered into new agreements. Essentially, the 1948 contracts simply reaffirmed the 1936 contracts and extended them. Modifications in the freight rates were also made. The "main" contract was extended until December 31, 1963 and the supplemental contracts (the trackage and operating agreements) were extended until December 31, 1967. Another supplementary letter agreement as to arbitration was executed in 1948.

## SYNOPSIS OF PRIOR LITIGATION

In February 1949 certain shareholders of IRCA instituted a derivative suit against UF in the New York Supreme Court, following unsuccessful efforts to readjust UF–IRCA relations and rates. After extensive discovery a trial commenced in 1953 before Mr. Justice Hammer of the New York State Supreme Court. After Judge Hammer's retirement, the trial continued before him as Referee. In June 1957, Referee Hammer filed a long report and concluded that UF had breached its fiduciary duty to IRCA. He found that the plaintiffs had established that UF exercised such domination over IRCA that it was really bargaining with itself when the basic

2. UF sold its stock interest in IRCA in early 1962.

1936 contracts were negotiated and executed, and that UF had used its control to obtain unduly low freight rates for itself and CAG. He awarded a judgment for over 4½ million dollars for the period before 1956, and ordered an increase in freight rates prospectively to the termination of the contracts. In March 1961 a supplemental judgment awarded IRCA close to 4 million dollars more representing the increased rates from January 1956 through December 1960.

The Appellate Division, First Department, affirmed the Referee's findings (Ripley v. International Railways of Central America, 8 A.D.2d 310, 188 N.Y.S.2d 62 (1959)). It agreed that the finding of domination and control by UF was abundantly supported by the evidence. It observed that "the existing relationship precluded any possibility of genuine arm's length bargaining between IRCA and UF." 8 A.D.2d at 317, 188 N.Y.S.2d at 72. The Appellate Division upheld the award of damages, as well as the determination fixing a fair rate for the future at $130 per banana car.

The Court of Appeals affirmed the Appellate Division, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960). The Court of Appeals held that the rates were divisible from the rest of the contracts. Divisibility was essential to the decision, for without it, the Court would have been met with the principle that "where a fiduciary contracts with its cestui regarding the individual property rights of the fiduciary, the transaction may be rescinded where there has been overreaching, but the cestui cannot knowingly retain the benefits which it receives under such agreements and simultaneously repudiate its obligations thereunder." 8 N.Y.2d at 436–437, 209 N.Y.S.2d at 292, 171 N.E.2d at 445. The Court affirmed the Referee's Judgment which had upheld the continued validity of the 1948 contracts and which had awarded compensation for unjustifiably low past rates and had adjusted the rates upward for the future.

During the progress of the *Ripley* litigation, the United States filed a civil antitrust complaint against UF in the Eastern District of Louisiana. This action was terminated early in 1958 by a consent decree, one section of which required UF to dispose of its IRCA stock not later than June 30, 1966. In January 1962, UF sold substantially all such stock to the BSF Company which in turn sold the great bulk of it to Trans Caribbean Airways; the latter has purchased additional stock so that it owns 340,000 of IRCA's 500,000 shares of common.

Beginning in 1961 UF began to liquidate its banana plantations in Tiquisate through sale, lease and otherwise. By the end of 1964 no more bananas were being grown in Tiquisate. It is alleged that UF required purchasers and lessees not to plant bananas on its former Tiquisate holdings.

On February 16, 1965, apparently in response to UF's abandonment of banana production in Tiquisate, IRCA instituted the present action in the Southern District of New York. It employed the attorneys who had represented the *Ripley* plaintiffs. There were six claims in the complaint as follows:

1. Loss of revenues and permanent damage to IRCA from UF's repressive tactics which prevented other banana shippers from using IRCA, 1928–61, $75,000,000. 2. Utilizing IRCA to facilitate UF's monopolistic designs by granting UF discriminatorily low rates, 1928–61, $55,000,000 less the principal paid on the State Court judgment (since withdrawn). 3. Restricting UF's own banana shipments over IRCA, 1949–64, and disposing of its banana plantations in the Tiquisate area for other uses beginning in 1961, $24,000,000. 4. Monopolization of water transportation of Guatemalan coffee to the United States on a basis whereby total charges via Barrios were equalized with those from West Coast ports of Guatemala and whereby IRCA was forced to charge higher rates on coffee not using UF ships, depriving IRCA of higher rail revenues it could

have obtained if there had been effective steamship competition, 1928–61, $15,000,000 (since withdrawn).[3] 5. Breach of contract to ship West Coast bananas (damages included in third claim). 6. Acquisition of control of IRCA by UF in violation of § 7 of the Clayton Act, 15 U.S.C. § 18 (damages equal to aggregate alleged in first four claims). See International Rys. of Central America v. United Fruit Co., 373 F.2d 408, 411 (2 Cir. 1967).

The defendant moved for summary judgment before Judge Ryan on the ground that the plaintiff was barred from prosecuting the antitrust counts of the complaint because it was attempting to split a cause of action and because the statute of limitations had run on the antitrust action. Judge Ryan determined "that the facts presented to the New York court in the *Ripley* case were substantially the same as those presented by this litigation." He dismissed pre-1961 *antitrust* claims against UF because of the rule against splitting a cause of action. 254 F.Supp. 233 (S.D. N.Y.1966). With respect to the statute of limitations issue, Judge Ryan found that at least since 1959 IRCA had had several independent directors who had the requisite knowledge to bring suit against UF for antitrust violations, and that at the very least the statute of limitations should not be tolled beyond the election of independent directors in 1959. Judge Ryan held, therefore, that any antitrust claim occurring before February 16, 1961 is barred by the four-year statute of limitations (15 U.S.C. § 15b). Summary judgment was consequently granted for the defendant on the first, second, fourth and sixth claims and so much of the fifth claim as was not based solely on an alleged breach of contract.

On appeal the Second Circuit, in an opinion by Judge Friendly, 373 F.2d 408, cert. denied, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967), rehearing denied, 389 U.S. 1059, 88 S.Ct. 757, 19 L.Ed.2d 861 (1968), affirmed Judge Ryan's decision so far as it barred claims for damages under the *antitrust laws* accruing before February 16, 1961. The Court of Appeals reversed Judge Ryan's determination, however, on the effect of splitting the causes of action. It held that "since the *Ripley* complaint did not and could not properly have asserted a claim under the federal antitrust laws [since the New York courts do not have jurisdiction to determine such issues], the judgment cannot have adjudicated that UF violated them . . . the utmost effect the prior judgment could have had in this action on any view would thus have been as an estoppel on questions of fact actually litigated; and we need not now decide how far it would even have that." 373 F.2d at 419. Since there was no motion for summary judgment on the contract claim, and the opinion of the Court of Appeals sheds no light on its status, see 373 F.2d at 417, 419, there is no law of the case on that status.

On October 9, 1968 IRCA commenced an action against CAG in the District of Massachusetts. The same claims were there asserted as in the UF action. In order to have both the CAG and UF actions (now UB) before the same Court, the Massachusetts action was dismissed and another one subsequently commenced in the Southern District of New York on February 14, 1972. It was consolidated on the same day with this action against UB.

The plaintiff has now consented to a dismissal of its second claim for damages predicated on its receipt of rates lower than prescribed in *Ripley*. Only four of the six claims survive today, i. e. claims 1, 3, 5 and 6. None of them extends to a period before February 16, 1961, except for the 5th claim insofar as it depends upon breach of contract, the claim not passed on by Judge Ryan.

3. On December 16, 1971 a stipulation dismissing the plaintiff's fourth claim with prejudice took effect.

The present motion for summary judgment is twofold: (1) that the antitrust claims (Sherman Act §§ 1 and 2 and Clayton Act § 7) must be dismissed for lack of standing of the plaintiff to sue under the antitrust laws; and (2) that the contract claim must be dismissed upon the ground that there was neither an express nor an implied obligation to furnish any particular volume of banana traffic to IRCA from the West Coast of Guatemala.

I

## THE ANTITRUST CLAIMS

The defendant agrees that, for purposes of the motion, the Court is to consider the allegations of the complaint as true. Nor does it contend that summary judgment would lie against these allegations as a matter of substantive antitrust law. Its point, and its only point, is that IRCA so clearly lacks standing to sue for what may be antitrust violations by UF that summary judgment must be granted.

The basic reason for IRCA's alleged lack of standing is that it was not a competitor of UF, that the antitrust violations of UF were directed against others, the independent banana producers of Guatemala rather than against IRCA, and that any harm which may have come to IRCA was of such an incidental nature that it gives rise to no claim for relief under the antitrust laws.

The defendant argues that even though § 4 of the Clayton Act provides that "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States," the courts have put a gloss upon "by reason of" so that IRCA is without standing.

The defendant does not rely on Supreme Court decisions for there is a paucity of such authority on the standing question. It relies, heavily, however, on the purported rule of the Second Circuit denying standing to plaintiffs in certain cases of alleged antitrust violations.

In searching for the rule to be applied on a motion for summary judgment we must be mindful of the defendant's own stricture that "plaintiff's standing to sue under the antitrust laws cannot be determined in the abstract, disassociated from the nature of the alleged violation of law and the injury claimed to have been suffered as a result." (Deft.Reply Br. at 44). We must also consider, to a certain extent, that the Court of Appeals for this Circuit has already had this antitrust action before it and failed, in a long and careful opinion, to express even a hint of doubt that the plaintiff had standing to sue.[4]

The claims here involved, in Judge Friendly's words, seek "loss of revenues and permanent damage to IRCA from UF's repressive tactics which prevented other banana shippers from using IRCA . . ." (373 F.2d at 411); and damages arising from "restricting UF's own banana shipments over IRCA, 1949–64, and disposing of its banana plantations in the Tiquisate area for other uses beginning in 1961 . . ." (*Id.*).

The defendant's paraphrase of these claims is "that the plaintiff railroad was allegedly injured because it did not obtain additional banana shipments *from competitors of the defendant* whose business was allegedly curtailed as a result of the claimed illegal acts; and that

---

4. Although it is not always persuasive that an appellate court *sub silentio* confirmed a rule that was not challenged, our own Court of Appeals has surely not thought such an assumption to be untenable. In Gottesman v. General Motors Corporation, 414 F.2d 956 (1969), Judge Feinberg noted in a case which the Supreme Court decided on a statute of limitations ground, Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) that "although the issue was not discussed, the Court evinced no qualms about dealing with a section 7 money damage claim." 414 F.2d at 960. The analogy is close.

this injury resulted from defendant's alleged monopolization of the banana market, *a market in which plaintiff was not engaged* . . . . Plaintiff's alleged injury is remote and indirect." (Deft.Br. at 81; emphasis supplied).

The plaintiff's paraphrase of these claims is that "Pursuant to [that] unlawful coercion of IRCA by United ('UF'), United made threats to IRCA to suppress, and did suppress, its own traffic over IRCA and *foreclosed others from coming in and shipping over IRCA* —third claim; and United required IRCA to discriminate against, and thereby *United suppressed independent traffic* over IRCA, first claim" (Pltf.Br. at 41, emphasis supplied).

Neither side has cited a case involving a railroad dominated by a monopolist, the activities of which allegedly caused a loss of revenue to that railroad. And, of course, there was actual privity here. Only analogy can be our guide.

■ Standing to sue for treble damages under the Sherman Act is not easy to classify. In tort law generally a formula so imprecise that it requires months of law school teaching to define its boundaries is often the only guide to liability and causation. In antitrust law definition is even more difficult because policy considerations are not necessarily an ingredient of logical analysis. A trial Judge must be guided by his sense of the policy considerations that have moved appellate courts rather than by a strict extension of logical analysis from the decided cases.

This Circuit has said that "those harmed only incidentally by anti-trust violations have no standing to sue for treble damages; only those at whom the violation is directly aimed, or who have been directly harmed may recover." Ryan, D.J. in Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678, 679 (2 Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956). In that case the plaintiff was a patentee who was not permitted to recover for antitrust violations committed against his exclusive licensee from whom he received royalties.

The patent licensor was thus added to the category of "shareholders and officers of corporations as well as creditors and landlords" who had no standing, 224 F.2d at 679, although the Court, at the same time, disclaimed any intention to categorize, stating that "no hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity." 224 F.2d at 680.

We were thus given a new category with a caveat. These categories were expanded over the years to embrace suppliers who were franchisors, Billy Baxter, Inc. v. Coca Cola Co., 431 F.2d 183 (2 Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), and patent licensors, SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2 Cir. 1969), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). A late word from the Court of Appeals reaffirms that a non-operating landlord of a motion picture theatre is still without standing. Calderone Enter. Corp. v. United Artists Theatre Circuit, 454 F.2d 1292 (1971).

The Court in the *Calderone* case, *supra*, made the distinction between one who has suffered economic damage because of his "relationship with the target" who may not sue, and the "targets themselves" who may sue. The rifle range metaphor certainly excludes the shotgun, but does it always also exclude the rifleman who shoots in an arc aiming at more than one person?

The policy rationale recently expressed is that the damage to one who is not a target is usually much more speculative and difficult to prove, and that opening the flood-gates may result in "overkill" 454 F.2d at 1295. "[T]o have standing one must be an object of an antitrust conspiracy" (p. 1296, n. 2); and it is intimated that even a non-operating landlord may, in such circumstances, find standing (p. 1296, n. 3).

An interesting analogy is the Ninth Circuit decision in Steiner v. 20th Century-Fox Film. Corp., 232 F.2d 190 (9 Cir. 1956) where the landlord complained that her tenant and motion picture distributors had conspired to destroy the value of the plaintiff's theatre by threatening to withhold first-run motion pictures from it unless the plaintiff agreed to reduce the fixed monthly rental. Judge Mansfield in the *Calderone* case, *supra*, agreed that "plaintiff there was thus a target of the alleged conspiracy," 454 F.2d at 1297, although a motion picture theatre landlord, as such, was not a proper plaintiff, at least in the Second Circuit.

Nor did our Court of Appeals accept the view of some commentators that it is completely at odds with the Ninth Circuit. On the contrary it cited, with apparent approval (as properly following the "target area" concept), Hoopes v. Union Oil Co., 374 F.2d 480, 485 (9 Cir. 1967) and Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073, 1076 (9 Cir. 1970). See 454 F.2d at 1297, n. 5 (although *Mulvey* had refused to follow Fields Productions, Inc. v. United Artists Corp., 432 F.2d 1010 (2 Cir. 1970).

The defendant also adds as authority for its position the recent case of GAF v. Circle Floor Co., 463 F.2d 752 (2 Cir. 1972) which held that *antitrust* damages had not been shown by a target company in a takeover attempt. The target company plaintiff was a manufacturer of floor tile and the alleged predators were the controlling stockholders of a large buyer of floor tile, whose control of the target company would tend to interfere with the sales of its competitors. The actual damages claimed resulted largely from a refusal by the defendant to buy the plaintiff manufacturer's goods in alleged pursuance of the scheme to obtain control.

The true holding of the case was that the particular damages alleged did not arise from *antitrust* violations, "diminution in competition," 463 F.2d 757. "The anti-competitive acts alleged in the complaint have not lessened GAF's ability to compete, and GAF has not therefore alleged that it has suffered any antitrust damages." *Id*. It is my respectful view that GAF simply was not injured by any antitrust violation, rather than that its injury was incidental, indirect, remote, or outside the target area.[5] The true standing cases, on the other hand, are generally situations where the plaintiff has in fact been hurt. I must conclude that the *GAF* case, *supra*, adds little to resolve the issue of the standing of one who has been *hurt* by antitrust violations. It does suggest, however, that restrictions on the use of the Tiquisate land which was sold by the defendant to prevent the raising of bananas may be too remote to support a claim for treble damages, since the restrictions did not harm the competitive position of IRCA as such. If there were competitor truckers or steamships or other purveyors of transportation they were *all* potentially affected by the decrease in shipments.

On the other hand, I respectfully suggest that the Supreme Court may have taken a more liberal view than our own Circuit on the question of standing. Although Perma Mufflers v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) was decided on the issue of whether a plaintiff in an antitrust suit could be barred because it was in *pari delicto*, the assumption was implicit that a dominated dealer who was prevented from dealing with others than the supplier-defendants had standing to sue. There the competitor of Midas, the culprit, was the one principally harmed rather than the distributor it-

---

5. "GAF alleges that the $730,000 in 'lost profits' was 'based upon the difference between that [the profits on] GAF's sales *to Circle Floor* normally would have been in' those years. GAF does not allege that it was unable to sell floor tile, only that it could not sell the 'normal' amount to Circle Floor; there is no factual allegation that GAF had been injured in its business due to a decrease in *total* sales." 463 F.2d at 759.

self. Although five separate opinions were written, none suggests that the plaintiff did not have standing to sue, aside from the question of *in pari delicto*.

We may also consider Continental Company v. Union Carbide, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). There the Court held that "the injury alleged to flow from a monopolist's elimination of one's independent suppliers [was not] so 'remote' as to justify refusing to let the damages issue go to the jury." 370 U.S. at 699–700, 82 S.Ct. at 1411. The entity destroyed was the independent supplier, but the injury to the buyer resulting from the illegal act was not so remote as to exclude standing. On the other hand, the plaintiff and the defendant were actual competitors.

Nor are the exclusive dealing cases, in which it has been held that a purchaser on whom an exclusive dealing contract is imposed is as much in the target area as competing sellers, entirely inapposite. See Bales v. Kansas City Star Co., 336 F.2d 439 (8 Cir. 1964); Lepore v. New York News, Inc., 346 F.Supp. 755 (S.D. N.Y.1972). One of the claims is that IRCA was not permitted to carry freight for UF's competitors at rates competitive to its own. Whether there were alternative modes of transportation and whether IRCA was directly injured remains to be seen.

There is no need to advert at this time to the plaintiff's claim of boycott except to note that the *Perma Mufflers* case confirmed also that a principal corporation and its own subsidiary can be co-conspirators in violating § 1 of the Sherman Act, 392 U.S. at 141–142, 88 S.Ct. 1981; and that the *Continental Company* case held it error to exclude proof by the plaintiff of "unilateral monopolization," 370 U.S. at 708–709, 82 S.Ct. 1404. On the other hand, the claim of boycott after January 1962 may fail entirely if the plaintiff cannot show that the restrictions on land use were more than incidental to damage suffered by IRCA, if it did suffer damage.

There is apparently no claim that the defendants asked any growers specifically not to deal with IRCA, but the facts require development before the legal issue is sufficiently delineated.

If we approach the present question of standing by categorization, IRCA does not fall within any category of the excluded. It is not a stockholder, employee, franchisor, patent licensor or landlord. We should rather approach the question, however, by way of the judicially sanctioned metaphor.

To make the metaphor of a "target" meaningful, one must, of course, assume that there is also a person aiming at it. The very concept implies intent. And "intent" was early held to be an element of restraint of trade. See Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 75–77, 31 S.Ct. 502, 55 L.Ed. 619 (1910).

In the present case we are limited by the earlier ruling on the statute of limitations to a period following February 16, 1961. We need not consider, therefore, whether IRCA had "standing" to sue for damages accruing in the earlier period when UF dominated its very existence with the consequent antitrust effects. In that sense much of the discussion of standing is academic.

By February 16, 1961 the following had occurred to change the picture. The Court of Appeals of New York had affirmed the Referee's decision requiring UF to pay higher rates to IRCA for transportation of bananas—$130 a car, a rate equal to that charged its competitors. The United States had obtained the consent decree requiring UF to divest itself of its holdings in IRCA by 1966.

The gravamen of the present claim that survives the limitations defense is that UF then turned upon IRCA as reprisal for its insistence on the fulfillment of the *Ripley* judgment and aimed its antitrust violations at IRCA as a direct and prime target. It is said to have cut its banana production on the West Coast for the purpose of laying

IRCA low, and to have restricted the use of its Tiquisate land for banana growing not only to thwart its potential competition but also for the avowed purpose of directly harming IRCA.

It is in the light of these allegations that the question of whether summary judgment will lie must be answered, remembering that we are to assume the allegations as true and the motion as directed solely to standing.

I think it would not be wise to consider in the abstract whether restraints of trade directed at a target such as IRCA for unlawful purposes afford the alleged victim standing to sue for treble damages. The charge presupposes the specific intent of the defendant to cause injury to the plaintiff. Here nuances are subtle and inferences from alleged facts tentative until the facts are proved. Indeed, one of the reasons for Fed.R.Civ.P. 52(a) is the need for an appellate court to know the facts found upon which the inference was made.

The results may differ, moreover, for the time periods possibly involved. If the theme is domination, the relevant period may be only from February 16, 1961 to January 1962 when the IRCA shares were sold by UF. Whether the plaintiff can show actionable antitrust damage after the domination ceased is another question. We must assume on this motion that until all the facts are in, we cannot determine whether policy based on precedent will support the standing of the plaintiff to sue. The matter is simply not ripe for summary judgment.

In short, I am convinced that I should not try to determine the *range* of fire under §§ 1 and 2 of the Sherman Act, without giving the plaintiff a chance to develop its thesis by evidence.

## SECTION 7—CLAYTON ACT—THE SIXTH CLAIM

The defendant seeks dismissal of the sixth claim which alleges violations of Section 7 of the Clayton Act on two grounds: (1) that IRCA, at the time of the acquisition of its stock by UF, was not "engaged in commerce," i. e. foreign commerce of the United States; and (2) that the Second Circuit now holds that the same kind of standing is required in a Section 7 claim as in a Sherman Act claim, and that the plaintiff does not have such standing. GAF v. Circle Floor Co., *supra*, 463 F.2d 752.

I have given my reasons for denying summary judgment on the issue of standing. The same reasons apply to the Section 7 claim, although I do not rule out the possibility of a dismissal on trial.

Since summary judgment is not being granted on the Sherman Act claim in any event, I shall hold in abeyance the question of whether IRCA was "engaged in commerce," a novel question that can better be decided when all the facts are presented. *Cf.* United States v. Times Mirror Company, 274 F.Supp. 606 (C.D. Cal.1967), aff'd per curiam, 390 U.S. 712, 88 S.Ct. 1411, 20 L.Ed.2d 252 (1968).

### II

### THE CONTRACT CLAIM

The amended complaint seeks damages for alleged breach of contract by UF's subsidiary, CAG which operated banana plantations on the Pacific Coast of Guatemala. UF is charged with a breach "through CAG" [Compl. ¶ 71]. The claim is that "in the years subsequent to 1948, defendant breached said contracts (a) by making shipments substantially below the 1948 level, and (b) by ceasing all shipments of bananas in or about August 1964" [Compl. against CAG ¶ 4].

The plaintiff contends that the contracts required CAG to ship substantial quantities of bananas for the life of the contract which is said to run to December 31, 1967. The defendants contend that the only term of contract applicable ended on January 1, 1963, and that the defendants, moreover, had no duty to ship any quantities of bananas even during the term but were simply to use IRCA exclusively. Both sides seek sum-

mary judgment on the issue. Neither side suggests that relevant parol evidence exists.

I have concluded that on the face of the writings the terminal date for the contract requiring CAG to ship bananas was January 1, 1963. For reasons that will appear I also hold that the plaintiff is barred from asserting a claim for any diminution of banana shipments by the defendants that occurred before December 31, 1960, on the principle of collateral estoppel (although the statute of limitations would have permitted suit against UF for six years before February 16, 1965 when this suit was commenced, or February 16, 1959).

*The Contract Expiration of January 1, 1963*

■ This case is, in a sense, a continuation of the *Ripley* case in the State Court. Both sides agree that the findings in *Ripley* are binding upon the parties in this Court. They differ, naturally, on the scope and meaning of some findings. There is obviously also an overhanging question of collateral estoppel.

It seems easier to approach contract interpretation *de novo* and then to see whether the findings or the doctrines of res judicata or collateral estoppel support or defeat the result.

In 1936 there were three basic contracts between IRCA and CAG: (1) the main agreement; (2) the trackage rights agreement; and (3) the operation of trains agreement. All were executed on the same day, September 17, 1936. The main agreement (Tab A1) defined CAG's obligation to use IRCA's railway for the transportation of its bananas. The other two contracts related to CAG's rights to use IRCA's lines (Tab B1); (a) the right of CAG to use IRCA's tracks, and (b) the right to use IRCA's personnel and facilities to transport CAG's banana trains (Tab C1). There were also separate rate contracts. In 1948 there were three new contracts of a similar nature.

The 1936 main contract had provided for a term of 20 years, expiring on September 17, 1956. The other 1936 contracts had provided for a term of 25 years. This difference in termination date was repeated in the 1948 contracts. The main contract was for a term of 15 years expiring January 1, 1963, and the other two contracts were for a period of 20 years, expiring January 1, 1968. All three contracts were executed simultaneously on May 18, 1948 to be effective as of January 1, 1948.

The five year differential in the 1948 contracts is the same as the five year differential that had existed in the 1936 set of contracts. Thus, the difference in termination date can hardly be thought inadvertent. If reason for the differential is sought, it may lie in the premise that if CAG desired to avail itself of its termination of the duty to ship exclusively by IRCA on January 1, 1963, it, nevertheless, still had another five years in which it could use IRCA's tracks and personnel without the exclusive obligation to ship only by IRCA.

The main 1948 agreement provides (¶ 1) that "until January 1st, 1963, the Guatemala Company [CAG] will exercise its rights under existing contracts with the Government of Guatemala to build a port on the Pacific seaboard only at such time and in such manner as shall be agreed by the International Company [IRCA] and the Guatemala Company in their mutual interest and also that during the said period, the Guatemala Company [CAG] will use the main lines of the International Company [IRCA] to transport its bananas and to carry its imported materials and supplies under such arrangements as the parties hereto may agree upon from time to time."

The obligation of CAG is thus expressly limited to "during said period" i. e. "until January 1st, 1963." Moreover, the exclusivity of such use is not made dependent on particular rates or particular volume, but only "on such arrangements as the parties hereto may agree from time to time."

Significantly also the 1948 main agreement provides (¶ 7): "If for any

reason the contract for trackage rights and the contract for operation of trains, both dated May 18, 1948, should terminate prior to January 1, 1963, this contract shall likewise terminate at the same time." The date January 1, 1963 must have been used because it was the terminal date of the contract. Suppose the contract for trackage rights which was to run to 1967 should terminate in 1965 for example. On the plaintiff's theory the main contract would still be in effect, but it would, nevertheless, not "likewise terminate," because it was later than 1963. It is logical to assume that the cut-off date for acceleration of termination of the main contract was fixed at January 1, 1963 only because that was understood to be the terminal date of the main contract. It is only on that theory that one can assume that a termination of the trackage agreement *after* January 1, 1963, should have no effect on the main contract.

The plaintiff argues that all the 1948 contracts must be read together and, if so read, constitute a requirements contract good until the end of 1967. Since if that were true there would have been no need to have two different terminal dates in the different contracts, the plaintiff interprets the consolidated contracts as meaning that CAG could only get off the hook in 1963 if it had in fact built a port on the Pacific seaboard. There is no warrant for this interpretation in the language used in the main contract which specifically limits CAG's obligation to ship via IRCA only to January 1, 1963. It is further refuted by the provision that termination of the trackage agreement *only before January 1, 1963* affects the main contract.

The conclusion that the obligation to ship exclusively by IRCA terminated on January 1, 1963 is supported, moreover, by the findings of Referee Hammer in the *Ripley* litigation:

Finding 265:

"Under the 1948 contracts, IRCA obtained the following advantages: . . . (f) An extension from 1956 *to 1963* of Agricola's [CAG] 1936 agreement not to build a Pacific port and to use IRCA's lines exclusively for the transportation of its bananas and imports." (emphasis supplied)

While the use of the period ending in 1963 as applying to CAG's obligation to ship exclusively may not have been a studied decision to choose 1963 rather than 1967 it also cannot be dismissed as inadvertent in view of the care shown by the Referee in making his exhaustive findings. It is a finding on the issue of how long the contract was to run, as bearing on the ultimate fairness of the rates.

Similarly, when the Referee referred to the fact that the new rates set by the Court would apply "until the termination *dates* of the present contracts" (Referee's Report and Decision, at 228; emphasis supplied), he can hardly be deemed to have believed that as the plaintiff now contends, there was only *one* termination date. And the judgment itself speaks of "dates provided therein for termination" (Record on App.Vol. 1, at 19).

The conclusion is fair that the Referee found that there was more than one termination date—1963 for the main contract and 1967 for the others.

IRCA itself, through its then counsel, referred to "the principal expiration date being 1963"; and construed the contracts so that they "obligated United to haul its Guatemala West Coast bananas *until 1963* over IRCA lines the considerable distance to the Atlantic Port of Puerto Barrios" (IRCA Br. to App. Div. 7/3/58, at 4–5; Ex. 7 on Lewittes Dep. in United Brands action; emphasis supplied).

IRCA counsel also wrote in a memorandum submitted on the *Ripley* judgment: "IRCA believes that it is highly advantageous for IRCA to have Agricola [CAG] bound by contract to ship its bananas by rail *until 1963*." (Ex. 2 Lewittes Dep. at 7–8; 12; emphasis supplied). And it must be remembered that it would have been to IRCA's be-

nefit to contend that CAG's obligation to ship was good until 1967. The State Court judgment must have been intended to include the finding that the obligation was to last no longer than until 1963.

The Court of Appeals stated that "the judgment appealed from determines those contracts to be valid and binding except with respect to the freight rates" (8 N.Y.2d at 436, 209 N.Y.S.2d at 292, 171 N.E.2d at 445). Nothing has been cited from the several opinions of the *Ripley* courts that fairly tends to show a finding that CAG was under an obligation to ship through 1967.

Since the terminal date for breach of the main contract is held to be January 1, 1963, any actionable breach must have occurred before that date and within the applicable New York six-year statute of limitations. CPLR § 213(2).

### *The Interpretation of the Contract*

■ UF and CAG contend, moreover, that even during the term of the main contract there was no obligation upon them to ship bananas in a volume not less than were shipped in 1948, or in any substantial amount whatever. The defendants maintain that the only obligation was to ship bananas exclusively via IRCA rather than by other means of transportation including the building of a port on the Pacific Coast. There is no claim that the defendants shipped by any other means.

A study of the agreements leads to that view. There is certainly no express provision requiring the defendants to ship any specific quantity of bananas. On the contrary, the provision that [CAG] will use the main lines of [IRCA] to transport its bananas . . . "under such arrangements as the parties hereto may agree upon from time to time" (main agreement) rather negates any fixed obligation to maintain the volume of traffic at the 1948 level. I also find that the issue was determined adversely to the plaintiff and that it had a full and fair opportunity to liti-

gate for the years before 1961 when the supplemental judgment was entered.

The Referee in *Ripley* found it to be an advantage to CAG that "(1) IRCA undertook to transport all bananas tendered by CAG for transportation to Puerto Barrios from Western Guatemala with no corresponding obligation on CAG to ship any given amount of bananas over IRCA at the rates specified in the contracts" (Finding D101).

In another finding he wrote: "No obligation was imposed on United [UF] to ship any such bananas." (Finding B360(d)). While this particular finding related specifically to the 1933 contract, he also found that "no substantial change was effected by the 1936 contracts with respect to the transportation of bananas by IRCA for CAG (Finding B374). And as we have seen, the changes in the 1948 contracts, except for an increase in rates, "were purely formal" (Finding B397).

■ Thus, it appears that both the issue of the term of the main contract and the issue of whether CAG had an obligation to ship any particular volume were determined adversely to the plaintiff's contentions by the Referee in *Ripley*. The claim of breach of contract being here on the theory of pendent jurisdiction, the State law is controlling on the applicability of the collateral estoppel doctrine to a given set of circumstances. See Ritchie v. Landau, 475 F. 2d 151, 2 Cir., decided March 14, 1973 at 154, and cases cited.

■ The New York courts apply the so-called "full and fair opportunity test" to the defense of collateral estoppel. See Schwartz v. Public Administrator, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); Ritchie v. Landau, *supra*. And when the party suing had been given a full opportunity to litigate the issue in a prior proceeding the defense of collateral estoppel will be sustained. See Goldstein v. Doft, 236 F.Supp. 730 (S. D.N.Y.1964), aff'd, 353 F.2d 484 (2 Cir. 1965), cert. denied, 383 U.S. 960, 86 S. Ct. 1226, 16 L.Ed.2d 302 (1960); Israel

v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956).

The supplemental judgment in the *Ripley* case covered the period to December 31, 1960. It is apparent, therefore, that any claim of breach of contract involving failure to ship bananas in volume as distinguished from the antitrust claim that arose before December 1960 could have been litigated in the State Court. Any claim of loss because of an allegedly insufficient volume was available as an item of damage.[6] That is true particularly in view of the claim that the contracts themselves were obtained through breach of the fiduciary relation.

I am compelled to conclude, therefore, that the only claim for breach of contract still open is a claim for the years 1961 and 1962 against UF; and against CAG it is limited to six years before the commencement of the action against it in Massachusetts on October 9, 1968.[7] Therefore, CAG would be responsible for damages for breach of contract from October 9, 1962 to December 31, 1962.

The plaintiff infers, on the other hand, that the finding of the Referee that rates should be fixed until the termination of the contract implies that CAG had an obligation to ship until such time. That conclusion does not follow. An anticipated practice of shipping is as much to be implied from the finding as a firm obligation to ship. In Judge Cardozo's phrase IRCA had the "advantage of economic opportunity." Walton Water Co. v. Village of Walton, 238 N.Y. 46, 50, 143 N.E. 786 (1924).

The plaintiff argues that a correlative obligation to ship a substantial volume of bananas must be read into the contract, or it is without adequate consideration. The answer is that the agreement to ship exclusively via IRCA is a sufficient consideration. Adequacy of consideration is not of judicial concern in determining the validity of a contract. Mencher v. Weiss, 306 N.Y. 1, 8, 114 N.E.2d 177 (1953); Warner-Lambert Pharmaceutical Co. v. John J. Reynolds Inc., 178 F.Supp. 655, 666, aff'd, 280 F.2d 197 (2 Cir. 1960); Restatement of Contracts § 81. Nor can the main contract be void for lack of mutuality when there is detriment to CAG because it must ship exclusively via IRCA and not build a port.[8] Hamer v. Sidway, 124 N.Y. 538 (1891); Clausen & Sons, Inc. v. Theo. Hamm Brewing Co., 395 F.2d 388, 390 (8 Cir. 1968); Fontainbleau Hotel Corp. v. Crossman, 323 F.2d 937, 942 (5 Cir. 1963); 1 Williston, Contracts §§ 102A, 103F. This distinguishes cases like Wood v. Lucy, Lady Duff-Gordon, *supra*, and Berlin & Jones Co., Inc. v. Monroe Paper Box Co., 137 N.Y.S.2d 155, 156 where unless the implied obligation were found, the contracts would have been unenforceable for failure of consideration.

If it is the fiduciary relation that makes *adequacy* of consideration a justiciable matter, the effect of such breach has already been disposed of in the State Court and may not be relitigated. Ritchie v. Landau, *supra*.

The plaintiff argues, finally that the defendants have committed a serious, in-

---

6. At no time after 1949 did the volume of banana traffic equal the 1948 volume.

7. By stipulation of the parties it is this date that is determinative of the statute of limitations.

8. The New York Court of Appeals, after holding the question of freight rates separable, held "the rest of the agreements supported by independent consideration." 8 N.Y.2d at 438, 209 N.Y.S.2d at 293, 171 N.E.2d at 446. The Referee had listed seven benefits to IRCA. While the agreement not to build a port on the West Coast was held to be a sham in *Ripley* the agreement to ship bananas exclusively via IRCA was itself a detriment to UF.

Even if the contract falls for lack of mutuality that is not enough reason to spell out an implied obligation of such a vague nature as the obligation to ship an unexpressed number of bananas. Not every contract that may fail for lack of consideration is revived by Wood v. Lucy, Lady Duff-Gordon, *supra*. An important element must be whether it is likely that if the parties intended such obligation they would not have expressed it.

dependent breach of contract by terminating the business of growing bananas on the Tiquisate plantations.

Since CAG did not abandon the Tiquisate plantations until after the contract expired on December 31, 1962, cases like Wigand v. Bachman-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618 (1918) and 407 E. 61st St. Garage v. Savoy Fifth Avenue Corp., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968) are not clearly in point. In each of those cases the defendant abandoned its entire business during the *existence* of the contract.

■ Nevertheless, since the termination of the Tiquisate venture is alleged to have begun as early as 1961, some of its reduction of volume may have been equivalent to a cessation. Whether even cessation in the absence of a specific covenant to maintain the business would be actionable is, in New York, however, not a matter for summary judgment. See *Savoy Fifth, supra.* And I must follow the New York Court of Appeals. Accordingly, the alleged substantial termination of West Coast business before December 1962, if there was such substantial termination, should await the trial.

With respect to so much of the fifth claim as relates solely to an alleged breach of contract, partial summary judgment is granted dismissing the complaint insofar as it claims damages for breaches committed after December 31, 1962 and before January 1, 1961 against UB and after December 31, 1962 and before October 9, 1962 against CAG.

With respect to antitrust claims 1, 3, 5 (except insofar as the claim is based on breach of contract) and 6, partial summary judgment dismissing the claims for acts committed before February 16, 1961 has already been ordered by Judge Ryan, and affirmed. The motion for summary judgment dismissing these claims for lack of standing to sue is denied.

It is so ordered.