**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Plaintiff-Appellant,**

v.

**UNITED BRANDS COMPANY, Defendant-Appellee.**

**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Plaintiff-Appellant,**

v.

**COMPANIA AGRICOLA de GUATEMALA, Defendant-Appellee.**

Nos. 192, 193, Dockets 75–7165, 75–7166.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1975.

Decided March 4, 1976.

234

Sidney Bender, New York City, for plaintiff-appellant.

David Klingsberg, New York City (Kaye, Scholer, Fierman, Hays & Handler, Milton Handler, Fredric W. Yerman, William Thomashower, New York City, of counsel), for defendants-appellees.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This action claiming various antitrust violations and breach of contract was brought by plaintiff International Railways of Central America (IRCA) against United Brands Co., successor in interest to United Fruit Co. (UF),[1] and its wholly-owned subsidiary Compania Agricola de Guatemala (CAG), by the filing of a complaint and summons on February 16, 1965.[2] Essentially it appears that plaintiff IRCA was dominated for many years by its controlling stockholder UF. (UF, however, sold virtually all of its IRCA stock in January 1962, pursuant to a 1958 consent decree which terminated a civ-

---

1. We will generally refer to the company as UF, its historical name; this is consistent with prior published opinions in this case.

2. Since that time the case has been the subject of one court of appeals decision, 373 F.2d 408 (2d Cir.), cert. denied, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967), as well as the two opinions below, 358 F.Supp. 1363 (S.D.N.Y. 1973) and 405 F.Supp. 884 (S.D.N.Y., 1975). A fuller historical statement of the facts will be found in those opinions.

il antitrust complaint brought by the federal government. See 373 F.2d 408 at 411. The decree will be discussed in more detail *infra* ). UF was and is in the business of importing bananas into the United States; its subsidiary CAG owned and operated banana plantations in western Guatemala, in an area called Tiquisate. IRCA had operated since the early part of this century the only railroad of any significance in Guatemala. Its main line ran from Puerto Barrios on the Atlantic Cost of Guatemala across the isthmus to the Pacific Coast. While all of plaintiff's assets were seized by the Guatemalan government in 1969 for alleged default on a government loan, the corporate entity remains and is the present plaintiff.

Of plaintiff's antitrust claims against UF, three survive (numbered as they were in the lower court): *First,* that UF, by requiring IRCA to discriminate in its rates and practices (such as preferential use of railroad equipment), prevented other prospective banana shippers from using IRCA's rail facilities from February 16, 1961 to December 31, 1961,[3] thus causing IRCA to lose the profits it would have gained thereby, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; *Third,* that UF restricted its own banana shipments over IRCA's lines from February 16, 1961 until 1964, and disposed of its Tiquisate plantations in such a way as to prevent others from cultivating bananas on the same land, thus causing IRCA to lose profits, in violation of sections 1 and 2 of the Sherman Act; *Sixth,* that UF's acquisition of a controlling interest in IRCA had the effect of probably lessening competition in and tending to monopolize the importation of bananas into the United States in violation of section 7 of the Clayton Act, 15 U.S.C. § 18.

The *Fifth* claim against UF, and the only claim against CAG, was for breach by CAG of certain 1948 contracts by failing to maintain a substantial volume of banana shipments from western Guatemala on IRCA's lines.[4]

## I. PRIOR PROCEEDINGS

In 1949 dissatisfied minority stockholders of IRCA instituted a derivative suit against UF in the Supreme Court of the State of New York, alleging that UF, as controlling shareholder of IRCA, breached its fiduciary duty to the latter by using its dominant position to procure from IRCA unfairly low rates for its banana shipments. An award of damages (totalling, with interest, some $8.5 million) to IRCA and a mandated increase in freight rates between the parties was eventually affirmed by the New York Court of Appeals, *Ripley v. IRCA,* 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960). Approximately four years later the instant antitrust and contract action was commenced, with plaintiff retaining the same attorneys who had won success in *Ripley.*

In 1966 UF moved to dismiss the instant suit on the theory that IRCA's claims were barred by the prohibition against splitting causes of action between *Ripley* and the instant suit, and by the statute of limitations. A granting of the motion on the first ground (254 F.Supp. 233 (S.D.N.Y. 1966)) was reversed, 373 F.2d 408 (2d Cir. 1967). However, this court agreed with the district court that the statute of limitations barred claims for alleged antitrust violations committed before February 16, 1961.

Thereafter, UF made a motion for summary judgment in the trial court, on two grounds: one, that the plaintiff lacked standing to sue under the antitrust laws, and two, that the contract claim had to be dismissed because there was neither an express nor an implied obligation on CAG's part to ship any particular volume of ba-

3. The earlier Second Circuit decision, note 2 *supra,* held that all antitrust claims arising prior to February 16, 1961, four years prior to the filing of the complaint, were barred by the applicable statute of limitations, 15 U.S.C. § 15b. This holding is now the law of the case. Apparently plaintiff chose December 31, 1961 as the other cut-off date for its first claim because, as noted *supra,* in January 1962 UF divested itself of its IRCA stock and thus lost its earlier control of IRCA.

4. The Second and Fourth claims against UF were withdrawn.

nanas on plaintiff's lines. By an opinion reported at 358 F.Supp. 1363 (S.D.N.Y. 1973), partial summary judgment was granted dismissing the contract claim insofar as it sought damages for breaches committed after December 31, 1962[5] and before January 1, 1961 against UF and after December 31, 1962 and before October 9, 1962[6] against CAG. In addition, partial summary judgment dismissing the antitrust claims for acts committed prior to February 16, 1961 (the cut-off statute of limitations date already found by the circuit court) was also granted. Id. at 1378. The motion for summary judgment was denied in all other respects. Id.

A trial without a jury was then held before District Court Judge Murray I. Gurfein on the issues of liability. The trial proceedings consumed fourteen days, with both sides producing a great deal of documentary and testimonial evidence; seven witnesses were heard, and their testimony consumed 2045 pages of transcript. On January 29, 1975, Judge Gurfein, now a Circuit Court judge sitting by designation, filed an extensive and comprehensive opinion to which was appended 245 findings of fact (some of them from the prior *Ripley* litigation) and twenty-one conclusions of law, dismissing the complaint and finding for defendants in all respects. From this opinion, and Judge Gurfein's earlier partial dismissal of IRCA's contract claim, the plaintiff appeals. For the reasons that follow, we affirm.

## II. FACTS

Since IRCA on appeal raises numerous factual as well as legal issues, it will be necessary to recite the facts in some detail.

The relationship between IRCA and UF extends back practically to the turn of the century. By the late twenties, UF, through stock control, dominated the affairs of IRCA. By 1936, UF was able to control the election of IRCA's nine directors, although for many years the extent of UF's dominance was concealed.

UF desired to exercise its control over IRCA to insure for itself low freight rates and special services for the shipment of its fruit, while at the same time denying them to its competitors. For example, on banana shipments from Western Guatemala, UF paid IRCA only $60 per railroad car, performing wharfage services and loading at Port Barrios with its own labor, whereas its competitors paid $130 per car, and an additional $72 to IRCA for wharfage and loading, upon which IRCA made a profit. This disparity in freight rates was provided in a 1933 contract between UF and IRCA. In 1936, these rates were reaffirmed, and additional provisions added; for example, CAG agreed to buy new locomotives and cars for use on IRCA tracks and agreed not to build a port on Guatemala's west coast to insure that the fruit produced at Tiquisate would be carried on IRCA's lines to east coast ports. In separate agreements, CAG was given the right to operate its banana cars over IRCA's lines, and IRCA agreed to operate CAG's trains and to maintain CAG's rolling stock.

In 1948 CAG and IRCA entered into new agreements, which in essence reaffirmed and extended the 1936 contracts. The main contract was to continue until December 31, 1962, and the supplemental trackage and operating agreements until five years thereafter.

As we have noted, the *Ripley* litigation commenced in state court in 1949, and the decree there fixed the subsequent rate for future banana shipments by UF over IRCA

---

**5.** The contract expiration date found by the court. 358 F.Supp. at 1374–76.

**6.** The January 1, 1961 date results from the fact that the judgment in *Ripley*, as supplemented, covered the period through December 31, 1960; the alleged failure to ship could have been recovered as an item of damage in that action. 358 F.Supp. at 1377. October 9, 1962 is the date six years prior to the commencement of another action by IRCA against CAG in the Massachusetts federal district court, later dismissed so that CAG could be sued along with UF in the Southern District of New York. The parties stipulated this date to be determinative of the statute of limitations as regards the contract claims against CAG. Id. at 1377 n. 7.

at $130 per car, the same rate then charged by IRCA to UF's competitors. Furthermore, as noted, UF was forced by the 1958 consent decree to sell its stock holdings in IRCA by 1966 and in fact in January 1962 sold all but one hundred shares. In fact, it was found below that the IRCA board of directors was independent of UF by February 16, 1961, the statutory cut-off date. At the May 1961 stockholders' meeting, UF did not vote its stock. Furthermore, it was found below that there had been at least three independent directors since 1959. In addition, the consent decree expressly prohibited contracts between UF and IRCA that would require IRCA to discriminate against other shippers.[7]

The court below also found as a fact that UF–CAG at all material times exported most or all of the bananas sent to the United States from Guatemala. However, what once was a profitable banana business began to deteriorate during the 1950's. UF's net earnings from its banana operations declined from $58.6 million per year in 1950 to $7.2 million in 1959. The Tiquisate plantation became plagued by Panama disease which rendered the area unsuitable for the cultivation of the more common type of banana (Gros Michel or Cocos type), and in addition was subject to excessive "blowdowns," or storms, which destroyed vast areas of plantings. As a consequence, UF's management was forced to take some sort of affirmative action.

As the lower court found, "[b]efore and after February 16, 1961 United officials informed IRCA that unless the *Ripley* judgment required rate of $130 per banana carload was reduced to $90, the Tiquisate operations might have to be liquidated. IRCA refused to reduce the $130 *Ripley*-decreed rate."[8] Furthermore, the main IRCA–CAG agreement, which included the scheduling of rates, was to expire on December 31, 1962, so that the freight rates were due for renegotiation at that time. However, IRCA took the position that the main contract did not expire until the end of 1967, and refused to consider the renegotiation of rates. (IRCA's interpretation of the contract expiration date was expressly rejected by the court below, 358 F.Supp. at 1374–76, which found the main agreement, by its very terms, to expire at the end of 1962, not 1967.) Thereafter, UF–CAG decided to liquidate the Tiquisate properties.

It was found as a fact below[9] that UF, starting in 1961, began a company-wide program to sell or otherwise dispose of many unproductive land holdings; eventually, properties in Ecuador, Costa Rica, Honduras, Guatemala, and other countries were liquidated. With respect to Guatemala, it was found that after the Communist takeover of that country in the early fifties, the political climate was at best inhospitable. Besides widespread riots and labor strife,[10] the government generally discouraged the growing of bananas in western

7. The pertinent portion of the consent decree (¶ VI(A)(9)–(10)) reads as follows:

(A) United is enjoined and restrained from, directly or indirectly:

(9) Entering into, adhering to or maintaining any agreement, contract or arrangement with any common carrier by rail or water in the Western Hemisphere which provides that the common carrier will not accord to competitors of United terms, privileges and treatment in the transportation of bananas for sale in the United States or destined for sale in the United States proportionately equal to those accorded by the carrier to United;

(10) Tortiously interfering with the performance of, or intentionally inducing the breach of, any contract related to any phase of the banana business between any of United's actual or potential competitors in the banana business and any grower, transporter, seller of purchaser of bananas, where such interference or breach affects the foreign or domestic commerce of the United States.

8. Findings of Fact 177 and 178 in the court below.

9. Finding of Fact 136.

10. For example, CAG's labor relations man in Tiquisate was fatally shot in May of 1961 (Finding of Fact 162(e)). And see Findings of Fact 160–63.

Guatemala, preferring instead that cotton be grown there.[11]

In an attempt to cope with the ravages of Panama disease and "blowdowns" on the more conventional strains of bananas, UF, in the early sixties, successfully developed a new type of banana, the Valery. It was found below that the Valery, besides being resistant to the disease, and less susceptible to tropical windstorms because of its shorter height, also required less land for cultivation, thus rendering some of UF's land holdings superfluous. On the other hand, its thinner skin made it less able to withstand long railroad hauls, such as the trek over the mountains from Tiquisate to Port Barrios.

A sharp disagreement arose between the parties as to whether Tiquisate was a logical area for UF to abandon when the decision to put the Valery into production was reached. Even on this appeal the parties buttress their contrary positions with masses of agronomic data. However, the lower court credited defendants' testimony and documentary evidence [12] which demonstrated that UF in good faith decided to close down Tiquisate for legitimate business reasons.[13]

Plaintiff further alleged that UF, in closing down Tiquisate, did so in such a way as to forestall its competition from moving in. Besides the unfavorable agronomic factors already mentioned, the only other banana producer of note in Guatemala, Standard Fruit, by this time had already closed down its Guatemalan plantation as the result of a hurricane striking its west coast plantations in November 1961. The court below found

that UF's decision to "phase out" Tiquisate was not taken until September 1962 at the earliest.[14]

While a few leases granted by UF on Tiquisate land did contain restrictive covenants prohibiting the use of the land for banana growing, the lower court found this not to be a general policy on UF's part.[15] As to whether UF made any good faith efforts to sell the land as a going concern for purposes of banana cultivation, the lower court first observed that the buyer's market was small, for the agronomic, economic, and political reasons already noted. In addition, UF could not sell land to its previous Guatemalan competitor, Standard Fruit (assuming the latter would even want to go back to western Guatemala after its own plantations there were destroyed by the 1961 hurricane), because such a sale was forbidden by the terms of the 1958 antitrust consent decree. UF did approach others of its competitors, but they evinced lack of interest for various reasons. The deal which, in plaintiff's estimation, came closest to fruition was one to sell the land to O. Roy Chalk, chairman of IRCA's board from 1963 to 1966. However, the lower court found Chalk to have been "slippery" in the sales negotiations, and that he never in fact put forth a firm or reasonable offer. In short, the court found that "[p]laintiff has failed to prove that Chalk had the intent, preparedness and capacity to purchase the Tiquisate division." [16] As a consequence, the deal foundered, and on January 9, 1964 the UF board decided to terminate negotiations with Chalk. The lower court stressed that "[t]hroughout the negotiation, United had made a good faith effort to sell Tiqui-

11. Finding of Fact 220.

12. Including a contemporaneous study, the "Miller Report," prepared for the company, which compared the potential of several of UF's divisions for Valery production, analyzing such factors as costs, wind damage, political climate, etc.; it concluded that Tiquisate was relatively the worst division of those studied, and that the next-to-worst was UF's facility in eastern Guatemala, called Bananera. The report concluded: "On the basis of the above, it is obvious that the future of the two Guatemala divisions for the production of varieties is ex-

tremely doubtful and they should get top priority in our plans for reduction of costs and disposal of properties."

13. We note in passing that at the trial below, plaintiff offered no opposing expert testimony of its own.

14. Finding of Fact 198; cf. Finding of Fact 184.

15. Findings of Fact 196, 212.

16. Finding of Fact 232.

sate to Chalk," and that this was factually substantiated in numerous ways.[17]

The Tiquisate banana operation was closed down by August, 1964, and the land sold by CAG.

## III. THE ANTITRUST CLAIMS

### (a)(1) The Third Claim—The Law

The appellant argues that even if UF had legitimate business reasons to abandon the Tiquisate operation, as was found below, the closing nonetheless violated both sections 1 and 2 of the Sherman Act. The violation of section 2 is premised on the theory that UF abused its monopoly power by refusing to deal with IRCA. Appellant relies upon cases such as *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) and *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) which do stand for the proposition that where a single trader refuses to deal in order to enhance its monopoly position, a section 2 violation may be found. Appellant further relies upon Judge Learned Hand's comment in *United States v. Aluminum Company of America* (Alcoa), 148 F.2d 416, 432 (2d Cir. 1945) that "no monopolist monopolizes unconscious of what he is doing." From these cases appellant concludes that UF, no matter how legitimate its reasons for giving up the Tiquisate operation, was in violation of section 2 of the Sherman Act.

■ While we agree that a specific intent to monopolize need only be found in a case where a defendant is charged with a conspiracy or attempt to monopolize, *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236, 1242 (1948); *United States v. Aluminum Company of America, supra,* 148 F.2d at 431-32, it does not follow that any act of the alleged monopolist irrespective of intent constitutes a section 2 violation. Judge Hand's comment was that no monopolist "*monopolizes*" unconscious of what he is doing. The action alleged to offend section 2 must be one which is monopolistic. The Supreme Court

has clearly indicated that in order to establish such a section 2 violation, the plaintiff must establish that the defendant had a deliberate or willful purpose to exercise monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778, 785–86 (1966); *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575, 1593 (1946). Monopoly power is well understood as " 'the power to control prices or exclude competition.' " *United States v. Grinnell Corp., supra,* 384 U.S. at 571, 86 S.Ct. at 1704, 16 L.Ed.2d at 786; *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264, 1278 (1956).

■ In view of these cases construing section 2 of the Sherman Act we cannot sensibly characterize the closing of Tiquisate as a use of monopoly power if we accept the findings of fact made below. While the court below assumed arguendo that "UF by the 1960's was a monopoly or close to a monopoly," 405 F.Supp. at 897, the court further found that IRCA, which had the only railroad providing a viable system to transport UF–CAG bananas from the west coast to Barrios was "itself a monopoly, armed with a judicial decree on rates." 405 F.Supp. at 895. It cannot be reasonably argued, as appellant does, that "as a matter of law" UF's abandonment of Tiquisate constituted a violation of section 2. The rebuff of IRCA to UF's request to reduce rates and its refusal to deal with UF except on its own terms, albeit judicially sanctioned ones, is indicative of its own strength and independence. UF in fact had no reasonable business alternative but to abandon an unprofitable and uncomfortable operation. This cannot possibly be characterized as an act of monopolization, which is the exercise of a power to fix prices or to exclude competition. Appellant's proposition boils down to the argument that a defendant which has a monopolistic position can never abandon an unprofitable operation but must continue to lose money be-

---

17. Finding of Fact 245.

cause shutting down might involve a loss of profit for the supplier of a service. No authority for this position has been advanced or discovered.

We have assumed, as the court below did arguendo, that UF was at this point in the possession of monopoly power. This is a dubious proposition at best.[18] After the *Ripley* decree UF had no ability to coerce IRCA into submission to lower freight rates. Whatever teeth the "monopolist" had were drawn by the 1958 consent decree which mandated the divestiture of its IRCA stock. Its net earnings from banana operations, as we have pointed out, declined from $58.6 million in 1950 to $7.2 million in 1959. Blowdowns, Panama disease and political upheaval had all taken a toll. Its inability to obtain a lower rate from IRCA itself demonstrates that UF was no longer able to exert monopolistic pressure. We cannot accept the position that the Tiquisate abandonment, irrespective of UF's intent, constitutes a section 2 violation.

■ With respect to section 1, appellant argues that a joint boycott or refusal to deal is a per se violation of section 1 of the Sherman Act. This of course has been an accepted tenet of antitrust law since *Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (*FOGA*). See *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broad-*

*way-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). The initial question is whether or not the conspiracy or combination alleged here to be between UF and its wholly-owned subsidiary, CAG, is prohibited by section 1 of the Sherman Act. Appellant relies upon *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) for authority that the so-called "intracorporate conspiracy" doctrine will support a conspiracy or agreement between a parent and its wholly-owned subsidiary. The appellees urge with equal vigor that *Kiefer-Stewart* involved a price-fixing scheme between two commonly owned enterprises which were held out to be and were in fact competitors, that CAG was here in fact the only customer·of IRCA, and that UF only dealt with IRCA through its subsidiary, and therefore *Kiefer-Stewart* cannot be sensibly extended to cover what in essence is a· unilateral action. See *Beckman v. Walter Kidde & Co.*, 316 F.Supp. 1321, 1325-26 (E.D.N.Y. 1970), aff'd per curiam, 451 F.2d 593 (2d Cir. 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972). Tempting though it is to become enmeshed in this thicket,[19] we need not do so and instead will assume arguendo, as the lower court did, that an intracorporate conspiracy did exist. However, the court below found no section 1 violation since the closing of Tiquisate was compelled by legitimate business con-

---

**18.** In assuming monoply power, Judge Gurfein considered the relevant market to be the "importation of bananas into the United States solely from Guatemala." Appellee argues persuasively that bananas imported from Central and South America and the Caribbean constitute the relevant market since they compete in the United States market with Guatemalan bananas. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580, 586 (1961). Moreover, appellee continues, there was no proof whatsoever of monopoly power, i.e., the ability to fix prices or exclude competition, in that market. Rather than remand for further proof we will assume the relevant market determined by the court below. Since it found no monopolistic intention or action, there was no section 2 abuse in any event.

**19.** See, e.g., *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71, 81–82 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (no violation of group boycott per se rule when manufacturer and its subsidiary agree to transfer their business from one wholesaler to another, at least absent a forbidden anti-competitive or monopolistic objective); M. Handler, H. Blake, R. Pitofsky, and H. Goldschmid, Cases and Materials on Trade Regulation 473–75 (1975) (note on intracorporate conspiracy); Willis and Pitofsky, Antitrust Consequences of Using Corporate Subsidiaries, 43 N.Y.U.L.Rev. 20 (1968).

siderations. Once again however appellant argues that *FOGA* stands for the proposition that a joint boycott is a per se violation and is not saved by allegations that the defendant's activities were reasonable in the circumstances.

 It is basic again in antitrust law that violations such as horizontal price-fixing and group boycotts are illegal per se and are not saved by protestations that the motivation of the defendants was decent or morally justifiable. The reason for the per se approach is to spare the courts from an examination of the underlying justification of the economic or other business motivation which prompted certain pernicious practices that the courts have determined are always or "per se" violative of section 1 of the Sherman Act. E.g., *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958). Thus in *FOGA*, upon which appellant places principal reliance, the F.T.C. was able to establish that the defendants, manufacturers of textiles and designers of original and exclusive women's dresses, had deliberately joined together to refuse to sell to those retailers who carried the wares of so-called "style pirates" who allegedly were copying defendants' original fabrics and designs and undercutting the prices of the defendants. The court found:

> [T]he aim of petitioners' combination was the intentional destruction of one type of manufacture and sale which competed with [defendant] Guild members. The purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts.

312 U.S. at 467–68, 61 S.Ct. at 708, 85 L.Ed. at 954. Having found the deliberate and intentional refusal to sell with the purpose and object of eliminating competition, the Court rejected the argument that the motivation of the Guild members was to protect themselves against "the devastating evils growing from the pirating of original de-

signs . . .." The appellant here however has failed to establish the deliberate and intentional combination to refuse to deal. The court below has found, as we have indicated, that the abandonment of Tiquisate was dictated by legitimate business considerations. Once having made that decision UF and CAG had no reason further to use IRCA transportation. They were out of business. Appellant has not cited nor have we found any case that has held or even suggested that companies which abandon a business are guilty of Sherman Act violations simply because as a result of their decision a vendor or supplier or customer will lose trade. This would indeed be an intolerable application of the Sherman Act. Cases such as *FOGA, Klor's,* and *United States v. Parke Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), relied upon by appellant, all involve joint refusals to deal by viable business entities which deliberately and intentionally refused to deal with a trader although otherwise able. In sum, on the findings below there was no such joint boycott and therefore the plaintiff cannot claim any benefits of the per se rule.

(a)(2) The Third Claim—The Facts

 We conclude therefore that appellant's third claim can only succeed if it can establish that the findings of fact below are clearly erroneous. Under Rule 52(a) of the Federal Rules of Civil Procedure findings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Moreover, in an antitrust case with a vast record where much depends upon the motive and intent of the defendants, the credibility of their live witnesses below is particularly significant. E.g., *United States v. Oregon State Medical Society*, 343 U.S. 326, 332, 72 S.Ct. 690, 695, 96 L.Ed. 978, 984 (1952). Appellant's thesis has been and remains that UF, which had clearly been guilty of predatory conduct in the past, had, since February 16, 1961 (the statutory damage cut-off date) deliberately cut down its traffic over IRCA

and eventually abandoned Tiquisate in retaliation for IRCA's refusal to lower freight rates, and so disposed of its property that other banana growers could not utilize it and become IRCA freight customers. Since IRCA was not a competitor of UF or CAG (as the court below noted), appellant was in the unenviable position of attempting to prove that the defendants deliberately sabotaged their own viable enterprise solely to destroy IRCA without any apparent business justification but reprisal. The position is not realistic and in fact we find nothing in the record to support it. On the contrary, the findings of fact below are squarely contrary and we find no reason at all to characterize them as clearly erroneous.

In addition to the facts we have noted before, Judge Gurfein's pertinent findings and conclusions are set forth in the margin.[20] While the appellant argues that Thomas Sunderland, former president of UF, had displayed animosity to IRCA and that his strategy was to abandon Tiquisate unless a rate reduction was achieved, Judge Gurfein below found instead that he was "impressed with the sincerity of" Mr. Sunderland and the other UF witnesses. (Three other UF witnesses testified that the land at Tiquisate was no longer needed in light of the development of the Valery banana.) Judge Gurfein continued: "They testified lucidly about the difficult problems they were facing in the 1959–1964 periods, difficulties which arose independently of the *Ripley* lawsuit. In general, I credit their testimony as supporting the legitimate motive in abandoning the Tiquisate operation in favor of other operations in other countries and in Eastern Guatemala." 405 F.Supp. at 895. As Judge Learned Hand observed in *United States v. Aluminum Company of America, supra,* 148 F.2d at 433, "Even upon an issue on which there is conflicting direct testimony, appellate courts ought to be chary before going so far [reversing findings of fact]; and upon an issue like the witness's own intent, as to which he alone can testify, the finding is indeed 'unassailable,' except in the most exceptional cases." Here there was no conflicting direct testimony. In fact, IRCA's president conceded that "it was perfectly understandable" for UF and CAG to consider rates "since the Tiquisate division was losing money and the rate was a factor." [21]

The claim that UF had disposed of its property in such a way that no banana producer was able to utilize it and by expressly restricting the uses to which the property could be put, again is not supported by the record. The court below found that the plaintiff had failed to prove the existence of any purchaser who had the "intent, preparedness and capacity" to grow bananas at Tiquisate; [22] that no such purchaser was prevented by UF from acquiring the land; [23] and that there were no restrictions on the future use of land sold at Tiquisate.[24]

20. "(Third Claim) The closing of Tiquisate was not an act in maintenance of monopoly power, but was part of a company-wide policy dictated by legitimate business considerations to shift United's production from Gros Michel to Valery, to close down those divisions less suited for the production of Valery because it required less land, and to transfer United's Guatemalan production from the West Coast to the East Coast which was closer to port and where abandoned Panama diseased land was available for Valery production." (Conclusion of Law 5).

"(Third Claim) Sunderland [UF's former president] recommended closing Tiquisate for legitimate business reasons, no so that United could achieve monopoly power in the importation of bananas." (Conclusion of Law 11).

"Sunderland, who made all key decisions regarding the operation and closing of Tiquisate, as well as concerning United's relationship with IRCA, did not take any action with specific intent to monopolize; to the contrary, he took affirmative steps to assure that United complied both with the consent decree and the anti-trust laws." (Conclusion of Law 12).

21. Conclusion of Law 13(h).

22. Finding of Fact 213.

23. Finding of Fact 214.

24. Findings of Fact 196, 212; see note 15 *supra* and accompanying text. We further note that those selling land for UF were not instructed to refrain from selling to banana growers (Finding of Fact 216); and that purchasers used the property to grow cotton and not bananas because of agronomic and economic advantages (no blowdowns, no Panama disease, the availability of truck transportation rather than rail)

Appellant argues that O. Roy Chalk, who was chairman of the IRCA Board from 1963 to 1966, was very much interested in the purchase of Tiquisate so that IRCA would not lose freight in the event of a UF abandonment. In addition, appellant contends that Chalk planned to form a new company to conduct a banana production operation and that the purchase would comply with the antitrust divestiture decree.[25] We agree with appellant that UF was initially interested in the Chalk deal and pointed out the advantages of Tiquisate as banana growing property. This however is hardly indicative of an interest to prevent competitors from entering the field. The letter of John M. Fox, UF's executive vice president, to Chalk dated November 1, 1963, upon which appellant relies to demonstrate UF's interest in the sale, also points out that Chalk as chairman of IRCA might be able to decrease the freight rate and the poor freight service which had deteriorated to the point that it was then taking twice as long to transport bananas as it had previously.

There can be no doubt that UF did pursue the Chalk negotiations by meetings and telephone calls over a six-month period. Neither is there any doubt that at a meeting in Boston on January 9, 1964 the Chalk negotiations were terminated by a unanimous vote of 17 of its top personnel. No minutes were kept and the only contemporaneous documentary evidence of what transpired was a memorandum entitled "Re: Consent Decree Problems," with Sunderland's hand-written statement, "All present were in favor of not selling to Roy Chalk." Appellant argues, without citation of authority, that it was reversible error for the court below to accept Sunderland's testimony as to reasons for rejecting Chalk which were inconsistent with other documentary evidence.

█ We have carefully examined the documentary evidence relied upon by appellant and cannot reasonably find it was inconsistent with the Sunderland testimony. Most pertinent to the issue is a letter from UF's executive vice president Fox to Chalk on January 10, 1964, advising him that only a few hundred acres of banana producing land remained which had not been sold or committed to others. While Fox's prior letter of December 23rd as well as a Sunderland-Fox-Chalk conference call of the same date had indicated that ample acreage was available or could be reacquired from purchasers, Fox on January 10th described the previous estimates as "overly optimistic." He further stated that the company could not renege on its commitments to Guatemalans, including employees with long service records who had planned on acquiring the property with their severance pay. He further explained that his present information was based on the report of UF's Guatemala manager, T. A. Holcombe, who flew to Boston to report the present status of the property on January 9th. There is nothing in any of the correspondence or documents relied upon by appellant which supports its position that UF failed to sell because Chalk would be a competitor. Had that been the posture of UF, one wonders why the long period of

and the Guatemalan government's encouragement of cotton growing (Finding of Fact 218) as well as its opposition to banana growing (Finding of Fact 220). While there was a finding that a few leases did preclude banana production, the court below also found that this was not a "general policy" and in fact the weight of the evidence was to show that UF sold the land generally without restriction.

25. That decree provided in pertinent part that "United shall sell to an Eligible Person (as hereinafter defined) production and transportation assets . . . including producing banana lands or producing banana lands and ba-

nana purchase arrangements, ships, and other essential accessory assets, reasonably calculated to be capable of importing annually into the East Coast, Gulf Coast and/or West Coast ports of the United States approximately 9,000,000 stems of bananas per year . . ." As already noted, the term "Eligible Person" specifically excluded Standard Fruit, then UF's chief competitor. However, the Justice Department expressed some misgivings about whether a sale of Tiquisate to Chalk would comply with the consent decree. Finding of Fact 241.

negotiation with Chalk.[26] Appellant's argument is based solely on inference and a characterization of the January 10, 1964 letter as a "cover up." Our review of the record persuades us that UF was concerned with the eligibility of Chalk as a purchaser as well as the eligibility of Tiquisate under the consent decree. The conference call of December 23, 1963 repeatedly indicates the concern of Sunderland that Department of Justice approval be obtained as well as a recognition that the property could not be held indefinitely for Chalk. The optimism of Fox and Sunderland even at that late date that the property could be assembled despite prior commitments, was in error as the Holcombe report established. However, that enthusiasm to make the deal despite Chalk's indications of reluctance are totally inconsistent with appellant's claim that Chalk was frozen out because he would be a prospective competitor. The court below was particularly painstaking with respect to the Chalk transaction, devoting fourteen pages of detailed findings which are buttressed by references to the testimony and exhibits.[27] We find them not to be clearly erroneous and in fact fully supported by the record.

■■■ To bolster its position that the closing of Tiquisate was justifiable, UF presented a large amount of agronomic and financial evidence to establish that this operation was financially unsound and was the worst of all the divisions in which to produce Valery bananas. Appellant urges as it did below that certain cost figures were inaccurately determined. UF produced expert testimony to support its conclusions and appellant produced none. Whether or not the data was precise in all respects is not here relevant. The district court, even though it assumed arguendo that the appellant's cost estimates were accurate, nonetheless found that at the time Sunderland received UF's figures he had no reason to question them and his reliance upon them was justified. There was no proof that they had been fabricated in order to provide a spurious basis for the action taken. The trial judge credited the testimony below that the action was taken on the basis of the reports and represented a legitimate business decision, not one based on contrived documents. We find no error in the findings below.

Reductions in shipments from Tiquisate after 1961 give no basis for antitrust liability. The court below found that Panama disease and blowdowns created whatever reductions occurred.[28] There is no proof that UF was motivated by any vindictive or anti-competitive considerations.

### (b) The First Claim—Discriminatory Practices

The first antitrust claim made below was predicated on alleged violations of sections 1 and 2 of the Sherman Act by reason of the discriminatory and repressive practices

---

**26.** Appellant argues that the court below committed "clear error" when in its opinion it stated that Chalk "apparently wanted to buy the Tiquisate land at $100 an acre (the upset price), get the equipment and plant for nothing, and buy it as a divestiture under the consent decree which would also require UF to sell him the appurtenances needed for a going business including a steamship fleet worth $5 million." Appellant argues that under section VIII (A) or (B) of the consent decree production assets were required to be sold, and that since Chalk in his letter of December 30, 1963 to Fox referred to that section, he could not have intended to get the assets for nothing. While Chalk may have been familiar with the decree, the letter referred to talks about the "purchase" by Chalk of *acreage*; it goes on to say, "it will be necessary for you *to turn over* to us simultaneously all the facilities . . . .." (emphasis

added). This is susceptible of the interpretation stated by the lower court. The memorandum of the conference of September 30, 1963 between UF and Chalk is enlightening. Mr. Blow commented, "Mr. Chalk then turned to Paragraphs B and C of Article VIII of the consent judgment. He said of Paragraph B that this paragraph necessarily called for 'a real money negotiation' and that his interest was in buying 'cheap.'" In view of Chalk's failure to come up with a total price or a means of independent financing, we agree with the court below that it is doubtful in any case that the Department of Justice would have permitted a divestiture to Chalk.

**27.** See in particular Findings of Fact 241–44.

**28.** Findings of Fact 176, 183.

of UF–CAG which prevented other competitors from using IRCA facilities and also by virtue of preferential treatment accorded to UF–CAG, all of which caused IRCA to lose profits. The claim is bottomed on the theory that IRCA was a victim of UF–CAG by reason of the latter's stock control of IRCA and also because of contractual obligations imposed upon IRCA. As we have previously indicated, the recovery period commences on February 16, 1961. The court below found that there was no continuing discrimination resulting either from prior domination of IRCA by UF–CAG or from any contract provisions which survived into the statutory recovery period.

■ Appellant cites a variety of antitrust cases involving per se monopoly and restraints of trade, most of which seem to be completely irrelevant and shed little light on the issue. In any event, the findings below establish without question that after February 1961 IRCA could not be sensibly characterized as a captive of UF–CAG. From February 16, 1961 onward no UF employees or officers were on the IRCA board; UF had sold all but one hundred shares of its IRCA stock by January 1962 and had made diligent efforts to dispose of it prior to that date; UF did not even vote its stock at the IRCA stockholders' meeting on May 31, 1961. UF was of course required by the consent decree to divest itself of its IRCA stock and there is nothing in the record to indicate that it did anything violative of the letter or spirit of the decree. In sum, the argument that IRCA was a helpless pawn of UF during the recovery period is completely unpersuasive.

The 1958 consent decree also prohibited contracts which would require IRCA to discriminate against other shippers. Counsel for IRCA, UF and the *Ripley* plaintiffs studied the existing contracts and found no discriminatory provisions. Distinguished outside counsel for IRCA advised UF that there was no agreement between UF and IRCA which did not comply with the provisions of the decree prohibiting discrimination. However, appellant argues that the court below was in error in finding that IRCA was not contractually obligated to discriminate in favor of CAG and UF against their competitors because the court overlooked a letter supplement to the 1948 "operation of trains agreement" which obligated IRCA to utilize certain locomotives and banana cars primarily for the use of CAG and secondarily for UF and for general public use only thereafter. That agreement did not expire until 1968. Moreover, the findings below are inconsistent as to whether or not IRCA did give preference to CAG in the allocation of banana cars. In Finding of Fact 57 the court found that "IRCA did not discriminate in the allocation of banana cars." However, in the opinion the statement is made that "[t]here is no doubt that CAG was given preferential treatment over Standard in the transportation of bananas from the West Coast."

■ Assuming however that discrimination did exist, the question remains whether or not IRCA has established any injury. Appellant argues that under *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) no public injury need be established where a per se Sherman Act violation has occurred. But of course it does not follow that a private plaintiff can recover without proof that he has in fact been damaged. Even assuming that IRCA has standing to sue here (see *Long Island Lighting Co. v. Standard Oil Co.*, 521 F.2d 1269, 1273–74 (2d Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295–96 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972)), plaintiff was not a competitor of UF–CAG and can only establish its damages if the allocation of cars precluded Standard from fuller use of IRCA equipment. In 1961, the only year during the recovery period when both Standard and CAG were competing, there was no proof of any shortage of banana cars; Standard never cancelled a cutting and never missed a ship.[29] Nor was there any evidence that Standard ever asked IRCA to

---

**29.** Findings of Fact 59, 88.

give it a greater share of the use of CAG cars or that IRCA ever refused such a request.[30]

Appellant's argument is totally "post hoc, ergo propter hoc": since in fact Standard did not expand and did eventually leave Guatemala in 1961, it must have been because UF–CAG had conspired to prevent expansion and to drive its only competitor out. There is no proof at all of this and in fact the court below found Standard left Guatemala "so far as the unrefuted evidence shows, only because a 'blow-down' destroyed its plantations in 1961."

 We conclude that even though a preferential banana car allocation clause remained unexcised despite the scrutiny of counsel, appellant has failed to prove any damage. In view of the chastening effect of the *Ripley* judgment and the terms of the consent decree, and the finding of the court below that UF was in good faith attempting to live up to the terms of the decree, it cannot be argued reasonably that UF–CAG through coercive means or by insistence on contract terms was demanding preferential treatment.

We have further reviewed appellant's other claims of discriminatory practices as to wharfage charges, practices and services at the pier, banana line haul rates and import line haul rates, all of which were discussed extensively below and rejected; we too find they are without merit and, for the most part, are based upon speculation rather than proof.

(c) The Sixth Claim—Section 7 of the Clayton Act

 In this claim, plaintiff seeks the same damages sought under the first Sherman Act claim but on the theory that the acquisition of IRCA stock by UF in 1928 and 1936 constituted a violation of section 7 of the Clayton Act, 15 U.S.C § 18. Even though the acquisition here preceded by many years the recovery period, it is clear that section 7 is applicable. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S.

586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). In that case du Pont had acquired a twenty-three per cent stock interest in General Motors approximately thirty years before the United States brought an action under section 7 of the Clayton Act for equitable relief, alleging that because of the stock interest, du Pont had obtained an illegal preference over competitors in the sale of supplies to General Motors. That stock interest continued until the time of suit. The Court held:

> The statutory policy of fostering free competition is obviously furthered when no supplier has an advantage over his competitors from an acquisition of his customer's stock likely to have the effects condemned by the statute. We repeat, that the test of a violation of § 7 is whether, *at the time of suit*, there is a reasonable probability that the acquisition is likely to result in the condemned restraints.

Id. at 607, 77 S.Ct. at 884, 1 L.Ed.2d at 1074 (emphasis added).

The court below, applying the *du Pont* rule, noted that the suit here was commenced in 1965 and since UF had sold its stock in 1962, "[a]t the time of the suit there was no possibility" of a potential lessening of competition or monopoly by reason of the acquisition. Appellant seeks to get away from the emphasized phrase on the basis that since in the *du Pont* case the United States was seeking divestiture, the Court meant only that the action would have been moot if du Pont had already disposed of its stock. It claims that where, in contrast, the section 7 plaintiff is a private litigant seeking *damages* the four year statute of limitations of section 4B of the Clayton Act (15 U.S.C § 15b) is vitiated if the "time of suit" test is employed. In view of the Supreme Court's expressions that Congress intended private antitrust litigation to be one of the surest weapons for effective enforcement of the antitrust laws, e. g., *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d

---

**30.** Finding of Fact 95.

405, 410 (1965), and our own previous holding in *Gottesman v. General Motors Corp.*, 414 F.2d 956, 961 (2d Cir. 1969) that section 4 be given a broad and not a narrow construction, we agree with appellant that the eleven month period between February 16, 1961 and the sale of the IRCA stock by UF in January 1962, is the relevant period to determine section 7 liability.[31]

■ However, the mere fact that UF continued to hold IRCA stock during this period does not automatically impose section 7 damage liability. *Gottesman v. General Motors Corp., supra,* 414 F.2d at 961. Plaintiff must also show that between February 16, 1961 and January 1962, UF did in fact so use its stock ownership as to cause injury to the plaintiff as a result of the anticompetitive effects proscribed by section 7. Id. at 965.

■ The record is devoid of any evidence that UF used its stock position in IRCA during the period in question to influence IRCA in any way. As we have previously noted, there was no proof that United controlled any IRCA directors from 1961 on; any control over IRCA by UF had been dissipated after February 16, 1961 despite its continued ownership of shares, which it was diligently seeking to sell; it did not even vote its stock at the annual meeting of May 1961. We repeat that UF had already been the victim of a large damage verdict in a derivative stockholder action brought by minority IRCA stockholders. It had further entered into a consent decree in 1958 forbidding discriminatory practices and re-

quiring partial divestiture. In view of the sanctions already applied UF's concern during the statutory period with its antitrust liabilities is obvious. We therefore see no merit in the section 7 claim since there is no evidence of the use of stock voting power by UF; to the contrary, there is in fact an abandonment of the tactics which had created its prior difficulties with the Department of Justice as well as with IRCA's minority stockholders.

## IV. THE *ZENITH* CLAIM

■ Although this court has previously held that all claims under the antitrust laws arising prior to February 16, 1961 were timed barred, 373 F.2d at 416–17, the appellant claims that under *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (decided after our prior decision but before the opinion below), it may recover damages resulting from acts prior to February 16, 1961. *Zenith* holds in effect that even though the acts creating the injury preceded the February 16, 1961 cut-off date, damages may be recovered if in fact and as a result injury was incurred after that date and if prior proof of those damages would have been impossible because their accrual was speculative or their amount and nature unprovable. Id. at 339–40, 91 S.Ct. at 806, 28 L.Ed.2d at 92.

*Zenith* involved a conspiracy which continued into the damage period; as noted by the court below, it is not clear that the *Zenith* exception to the usual antitrust peri-

---

**31.** See, e. g., *Poster Exch., Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 124–29 (5th Cir. 1975) (re alleged antitrust conspiracy and monopoly. Court relied on the "continuing conspiracy" theory, i. e., that plaintiff "is entitled to recover for damages accruing during the four year period preceding this suit which have been caused by continuation of the alleged injurious acts of the alleged conspiracy and monopoly during that period," to uphold plaintiff's claim against a statute-of-limitation defense); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir. 1975) ("A civil cause of action under the [antitrust acts] arises at each time the plaintiff's interest is invaded to his damage, and the statute of

limitations begins to run at that time."); Stein, Section 7 of the Clayton Act as a Basis for the Treble-Damage Action: When May the Private Litigant Bring His Suit?, 56 Calif.L.Rev. 968, 980–95 (1968) and cases cited. Cf. 1 M. Handler, Twenty-Five Years of Antitrust 243–44 (1973) (originally published as Handler, Annual Review of Recent Antitrust Developments, 12 Record of N.Y.C.B.A. 647 (1957)) (*du Pont* stands for proposition that "[i]f there is a reasonable probability that the *retention* of the stock may result in the prohibited anticompetitive consequences, the Government may take action regardless of the passage of time" (emphasis added)).

od of limitations would be applicable to a case such as this where the conspiracy had been terminated prior to the damage period by the consent decree and the *Ripley* judgment. In any event, Judge Gurfein found that *Zenith* was not applicable since there was no proof that prior antitrust violations had caused damages during the period after February 16, 1961. That such a causative link between the alleged antitrust violation and the alleged injury is necessary to plaintiff's claim is clear. E. g., *Billy Baxter, Inc. v. Coca-Cola*, 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

We need say nothing more about the third claim which is principally based on events occurring within the limitations period. With respect to the first claim, appellant urges that because of UF's prior monopolistic and discriminatory practices, other competitors were precluded from entering the banana production business in Guatemala, thus preventing IRCA from reaching "its maximum potential" by February 1961, and therefore its revenues were less than they should have been during the damage period. Moreover, this damage, it is argued, was purely speculative prior to the cut-off date, thus bringing it within the *Zenith* exception.

▇▇ We agree with the court below that while this is a good antitrust theory, plaintiff nonetheless has the burden of establishing that either UF's competitor Standard was discouraged from expanding its holdings or that other potential competitors of UF were prevented from entering the field by UF's pre-1961 antitrust activity. IRCA, which offered no evidence whatever of Standard's frustration or independent entry

preclusion by UF, again argues that since the pre-1961 violations were per se violative of the Sherman Act [32] there is no need for it to establish that its customers had the intention, preparedness and capacity to ship more bananas than they actually shipped. But the law seems well settled that the private antitrust litigant has to establish the fact of damage (here, its loss of customers) by evidence of the existence of ready, willing and able purchasers of IRCA services. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126–27, 89 S.Ct. 1562, 1578, 23 L.Ed.2d 129, 149–150 (1969); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir.), cert. denied, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 395–96 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). This principle was properly applied below. IRCA now claims that this rule only applies where the defendant's competitor is the antitrust plaintiff. While it is true that the cases announcing the principle all involve actions by putative competitors seeking to establish lost profits, it must apply *a fortiori* to IRCA whose alleged lost profits are dependent upon the presence of a viable customer. The contention that the court below committed error on this point is therefore frivolous.

## V. REMAINING CLAIMS AND CONCLUSION

Appellant's contract claim is without merit and we affirm this point on Judge Gurfein's well-reasoned opinion below (358 F.Supp. 1363). Appellant also claims error in the exclusion of certain *Ripley* findings

**32.** The cases relied on by appellant (e. g., *United States v. Reading Co.*, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760 (1920); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)) for the proposition that "equipment discrimination" constitutes a per se violation of the Sherman Act are not in point. We need not elaborate since, as we have already indicated, the plaintiff here as a private antitrust litigant must establish that in fact damage occurred. Under the *Zenith* principle the causa-

tive acts must have occurred before 1961 but the damage must not have been provable until after 1961. Neither requisite was established here.

We also note that equipment preferences or discrimination are not to be found in the usual litany of per se violations under the antitrust laws, e. g., *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958).

which it alleges are collaterally binding upon UF. We find no abuse of discretion by the trial judge who wrote separate memorandum opinions (filed April 26 and May 15, 1974) stating the basis for his determination. The further claim that certain documents were improperly excluded is equally meritless. There is no indication that any of the documents would have changed the result below.

We conclude that appellant's antitrust theories which would impose liability under sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act are untenable given the findings of fact below. Even assuming standing, post-1961 monopoly, and the application of the intracorporate conspiracy doctrine, all of dubious validity here, it is clear that no liability exists. Appellant's only chance of success on this appeal depends upon a showing of clearly erroneous findings of fact. Our review shows that the findings are predominantly supported by the record and where they are not, cannot be termed clearly erroneous, particularly in view of the court's conviction that the UF officers' testimony was straightforward and credible. Plaintiff's case rests in sum primarily upon dubious and unsupported inferences. While the appellant has assiduously combed the extensive record here and extracted occasional comments which tend to serve its purpose, the errors uncovered are either harmless or in fact are overborne by the weight of the evidence.

The judgment below is therefore affirmed.